770 F.2d 949
 Major General James F. COCHRAN, III, Plaintiff-Appellant,
v.
The UNITED STATES of America, the Department of Defense and
the Department of the Army, Agencies and
Departments thereof, Defendants-Appellees.
 No. 84-8765.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 6, 1985.
 
 Charles M. Jones, Hinesville, Ga., for plaintiff-appellant.
 Kenneth C. Etheridge, Asst. U.S. Atty., Savannah, Ga., Lt. Col. Marshall M. Kaplan, Army Litigation Div., Office of the Judge Advocate General, Dept. of the Army, The Pentagon, Washington, D.C., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Georgia.
 Before RONEY and HILL, Circuit Judges, and PITTMAN*, District Judge.
 JAMES C. HILL, Circuit Judge:
 
 
 1
 Plaintiff/appellant Major General (Retired) James F. Cochran alleges a violation of subsection (b) of the Privacy Act, 5 U.S.C. Sec. 552a(b), by the Army's issuance of a press release concerning a military, non-judicial disciplinary proceeding initiated against him. We affirm the district court's grant of summary judgment in favor of defendants/appellees, concluding that the information was properly disclosed to the public, and that appellant may not maintain a Privacy Act claim as a result of any minor violation of Army regulations implementing the Freedom of Information Act that might have occurred.
 
 FACTS
 
 2
 The facts in this case are undisputed. As stated by the Claims Court:
 
 
 3
 In May 1981, the plaintiff, then Army Major General James F. Cochran, III (MG Cochran), requisitioned a military aircraft for a round trip flight for himself and his wife from Fort Stewart, Georgia (at which he was then commandant), to an airport near the United States Military Academy at West Point, New York, where they attended graduation ceremonies for their son.
 
 
 4
 In March, 1981, MG Cochran gave his personal property, a boat stove to a Mr. Watford, a civilian government employee, under his command at Fort Stewart, for conversion from alcohol to propane use and for repair. Watford purchased $50 in repair parts out of his own funds, but was unsuccessful in his efforts to repair the stove. He then took the stove to the refrigerating, heating and plumbing shop at Fort Stewart, where the foreman and assistant foreman respectively performed the appropriate major repairs and adjustment to it using government purchased supplies.
 
 
 5
 After receiving information as to these transactions, on May 28, 1981, the Army Vice Chief of Staff directed the Inspector General to inquire into allegations that MG Cochran had committed improprieties. Thereafter, on June 20, 1981, a colonel from the office of the Inspector General briefed General Robert M. Shoemaker, Commander, United States Army Forces Command, Fort McPherson, Georgia, on the results of the Inspector General's investigation.
 
 
 6
 Cochran v. United States, 1 Cl.Ct. 759, 761 (1983), aff'd, 732 F.2d 168 (Fed.Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 175, 83 L.Ed.2d 110 (1984).
 
 
 7
 On June 23, 1981, General Shoemaker initiated nonjudicial punishment proceedings against Cochran, pursuant to Article 15 of the Uniform Code of Military Justice, 10 U.S.C. Sec. 815. Cochran was charged with wrongful appropriation of a government aircraft, and with causing diversion of governmental facilities and manpower. After a July 2, 1981 hearing, Shoemaker found Cochran guilty of both charged offenses on July 6th. As punishment, Cochran received a written reprimand and a $2,000.00 fine.
 
 
 8
 Meanwhile, inflammatory rumors had begun to circulate in the Fort Stewart area about an internal Army investigation being conducted at that post. See infra, n. 4. To quell those rumors, Major General Galvin, who had succeeded Cochran as Commander at Fort Stewart, issued a press release to local news media on June 16, 1981.[1] This news release formed the basis for a story reported in the June 17th issue of the Savannah Evening Press and other local papers. After issuance of this release the Public Affairs Office at Fort Stewart continued to receive press inquiries into the matter, but declined to comment while the investigation continued.
 
 
 9
 On July 8, 1981, after Cochran's disciplinary proceedings had been completed, the Army issued a press release in response to the media inquiries. This press release briefly summarized the findings of the non-judicial proceeding and the discipline imposed on appellant,[2] and was apparently provided only to those members of the media who had lodged standing oral inquiries.[3] The press release was apparently intended, at least in part, to dispel rumors in the community regarding Cochran's misconduct which were far more egregious than the conduct that had actually occurred. The Public Affairs officer at Fort Stewart was also supplied with a list of prepared questions and answers to be used internally for guidance in dealing with further questioning from the media.[4] News articles based on the press release appeared in the Savannah Morning News, the Atlanta Constitution, and the Atlanta Journal on July 9, 1981.
 
 
 10
 Cochran appealed the non-judicial punishment to Major General Clauson, the Judge Advocate General of the Army, and then to the Claims Court. The Claims Court affirmed the findings on the wrongful appropriation of government aircraft charge, but vacated the finding that Cochran had wrongfully accepted a gift from a subordinate and remanded to Major General Clausen to determine if the punishment received was appropriate in light of the dismissal of the "boat stove" offense. Cochran v. United States, 1 Cl.Ct. 759. Clausen reduced the fine by $200.00, a decision affirmed by both the Claims Court and the Federal Circuit Court of Appeals.
 
 
 11
 On July 9, 1983, Cochran filed the complaint in the instant case, alleging seven causes of action arising out of the July 8, 1981 release of information concerning the imposition of non-judicial punishment upon him. In this appeal we are only concerned with count one of this complaint, in which Cochran seeks damages on the grounds that the defendants wrongfully disclosed information concerning him in violation of subsection (b) of the Privacy Act, 5 U.S.C. Sec. 552a(b).[5] On this count, the district court granted summary judgment in favor of the appellees on September 7, 1984, concluding that the Freedom of Information Act (FOIA) exception to section 552a(b) was applicable despite the absence of written FOIA request, and that under the balancing test employed pursuant to subsection (b)(6) of the FOIA, 5 U.S.C. Sec. 552(b)(6),[6] the public interest in disclosure of the information outweighed Cochran's privacy interest.
 
 DISCUSSION
 
 12
 The present action alleges a violation of subsection (b) of the Privacy Act, which provides that
 
 
 13
 No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be--
 
 
 14
 ....
 
 
 15
 (2) required under section 552 of this title [the FOIA].
 
 
 16
 5 U.S.C. Sec. 552a(b). Appellant contends that the Army's disclosure of information in the July 8th press release was not "required" under the FOIA, because there was never any written FOIA request for the information, and because the information constituted "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." See 5 U.S.C. Sec. 552(b)(6). Appellees respond that a written FOIA request for information was not necessary for the issuance of the press release, and that under section 552(b)(6) the public interest in the disclosure of this information outweighed appellant's privacy interest in preventing disclosure.
 
 
 17
 A. The Privacy Act and the Freedom of Information Act
 
 
 18
 The Privacy Act was passed in 1974 to protect the privacy of individuals identified in government information systems by regulating the collection, maintenance, use and dissemination of personal information and prohibiting unnecessary and excessive exchange of such information within the government and to outside individuals. Congressional Findings and Statement of Purpose, Privacy Act Sec. 2, 5 U.S.C. Sec. 552a historical note; see Thomas v. United States Department of Energy, 719 F.2d 342, 345-46 (10th Cir.1983); Johnson v. Department of Treasury, I.R.S., 700 F.2d 971, 974-76 (5th Cir.1983); Antonelli v. Federal Bureau of Investigation, 536 F.Supp. 568, 572 (N.D.Ill.1982), rev'd on other grounds, 721 F.2d 615 (7th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984). Congress was chiefly concerned with the potential for misuse of the enormous amounts of personal information collected by government agencies (often for limited purposes and occasionally through improper investigations) and stored in computers. See Thomas, 719 F.2d at 345; Johnson, 700 F.2d at 975-76; S.Rep. No. 1183, 93d Cong., 2d Sess. 1-2., reprinted in 1974 U.S.Code Cong. & Ad.News 6916, 6916-17 and in Legislative History of the Privacy Act of 1974 S.3418 (Public Law 93-579): Source Book on Privacy at 154-55 (1976) [hereinafter cited as Source Book]; H.R.Rep. No. 16373, 93d Cong.2d Sess. 3-4, reprinted in Source Book at 296-97. To that end, the Privacy Act "limits the kind of information that can be collected or disclosed and imposes a standard of quality and diligence on the maintenance of government records," Doe v. United States Civil Service Commission, 483 F.Supp. 539, 555 (S.D.N.Y.1980). A private cause of action is provided to enforce those rights. 5 U.S.C. Sec. 552a(g).
 
 
 19
 The FOIA, on the other hand, is a broad disclosure statute which evidences a "strong public policy in favor of public access to information in the possession of federal agencies." Brown v. Federal Bureau of Investigation, 658 F.2d 71, 73 (2d Cir.1981); see Department of Air Force v. Rose, 425 U.S. 352, 360-62, 96 S.Ct. 1592, 1598-1600, 48 L.Ed.2d 11 (1976); Environmental Protection Agency v. Mink, 410 U.S. 73, 79-80, 93 S.Ct. 827, 832-833, 35 L.Ed.2d 119 (1973). It provides that "[e]ach agency shall make available to the public information" through regulatory procedures, 5 U.S.C. Sec. 552(a) (emphasis added), and sets forth certain categories of information which are exempt from compelled disclosure. 5 U.S.C. Sec. 552(b). Congress provided that nothing in the FOIA should be read to "authorize withholding of information or limit the availability of records to the public, except as specifically stated" in the Act. 5 U.S.C. Sec. 552(c); see Rose, 425 U.S. at 361, 96 S.Ct. at 1599. Therefore, the disclosure requirements of the FOIA must be construed broadly, the exemptions narrowly, Rose, 425 U.S. at 366, 96 S.Ct. at 1601 (quoting Vaughn v. Rosen, 523 F.2d 1136, 1142 (D.C.Cir.1975)); and the burden of proof is upon the party seeking to invoke an exemption from mandatory disclosure. Mink, 410 U.S. at 80, 93 S.Ct. at 832.
 
 
 20
 In view of the contradictory purposes of the Privacy Act and FOIA, clashes between the two statutes are inevitable.
 
 
 21
 [W]hen a government agency receives a request for information of a personal nature, pertaining to a person other than the one making the request, the agency must reconcile two conflicting duties: the duty to make available to the public the information in its possession; and the duty to safeguard the privacy of individual members of the public.
 
 
 22
 Brown, 658 F.2d at 73.
 
 
 23
 Nevertheless, the relationship between the two acts is clearly established. Subsection (b)(2) of the Privacy Act expressly defers to the mandatory disclosure requirements of the FOIA by prohibiting the nonconsensual release of personal information unless the information is required to be disclosed under the FOIA.[7] Brown, 658 F.2d at 73; Antonelli, 536 F.Supp. at 572; Florida Medical Association, Inc. v. Department of Health, Education & Welfare, 479 F.Supp. 1291, 1306 (M.D.Fla.1979). "The net effect of [Sec. 552a(b)(2) ] is to permit disclosure where the FOIA requires it, but to prohibit disclosure where the FOIA allows the agency to refuse to disclose." Plain Dealer Publisher Co. v. United States Department of Labor, 471 F.Supp. 1023, 1030 (D.D.C.1979). Therefore, our task in this case is to determine whether the challenged disclosure of information was "required under the FOIA." If it was, there is no Privacy Act protection. If it was not, there is a Privacy Act violation. More specifically, we must determine whether the information was properly disclosed in the absence of a written FOIA request, and whether the information falls within the section 552(b)(6) FOIA disclosure exemption for "clearly unwarranted invasions of privacy." We begin with the latter inquiry.
 
 
 24
 B. Did Press Release Amount to a "Clearly Unwarranted
 
 
 25
 Invasion of Privacy?"
 
 
 26
 Under exemption six of the FOIA, personal information in government agency files is exempted from mandatory disclosure only if: (1) the information was within personnel, medical, or similar files; and (2) a balancing of individual privacy interests against the public interest in disclosure reveals that disclosure of the information constitutes a "clearly unwarranted invasion of privacy." Miami Herald Publishing Co. v. United States Small Business Administration, 670 F.2d 610, 615 (5th Cir. Unit B 1982); see Rose, 425 U.S. at 370-76, 96 S.Ct. at 1603-06.
 
 
 27
 The district court found that the information disclosed in the present case was of a sufficiently personal nature to constitute a "similar file." Since the appellees have not disputed this finding on appeal, we assume that it is correct and move on to consider whether the disclosure of information relating to the Article 15 disciplinary proceedings brought against appellant amounted to a "clearly unwarranted invasion of privacy."
 
 
 28
 In addressing this issue we employ a balancing test, weighing an individual's right to protection of privacy against the public's right to disclosure of government information. See Rose, 425 U.S. at 372, 96 S.Ct. at 1604; Chamberlain v. Kurtz, 589 F.2d 827, 841-42 (5th Cir.), cert. denied, 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). If the balance is equal the court should tilt the balance in favor of disclosure.[8] Board of Trade v. Commodity Futures Trading Commission, 627 F.2d 392, 398 (D.C.Cir.1980).
 
 
 29
 We assume that appellant had a privacy interest in keeping the information as to his disciplinary proceedings confidential. However, the basic purpose of the FOIA is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." National Labor Relations Board v. Robbins Tire & Rubber Co., 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978); see Westchester General Hospital, Inc. v. Department of Health, Education and Welfare, 464 F.Supp. 236, 239 (M.D.Fla.1979). Therefore, courts favor disclosure under the FOIA balancing test when a government official's actions constitute a violation of public trust. For example, in Columbia Packing Co. v. United States Department of Agriculture, 563 F.2d 495 (1st Cir.1977), the First Circuit upheld an order requiring disclosure under the FOIA of personnel records of two former federal meat inspectors who had been convicted of accepting bribes from meat packing companies, stating that "the public has an interest in whether public servants carry out their duties in an efficient and law-abiding manner." Id. at 499. The court emphasized the important deterrence function served by public disclosure of the information, expressing hope that disclosure would "forestall similar occurrences" in the future. Id. at 499; see also Congressional News Syndicate v. United States Department of Justice, 438 F.Supp. 538, 544 (D.D.C.1977) (court required FOIA production of certain records, compiled by Watergate Special Prosecution Force, listing contributors and recipients of secret political fund-raising organization which violated Federal-Corrupt Practices Act); Tax Reform Research Group v. Internal Revenue Service, 419 F.Supp. 415, 418 (D.D.C.1976) (FOIA balancing test weighs "obvious public interest in a full and thorough airing of the serious [government] abuses that did in fact occur").
 
 
 30
 We agree that the balance struck under FOIA exemption six overwhelming favors the disclosure of information relating to a violation of the public trust by a government official, which certainly includes the situation of a misuse of public funds or facilities by a Major General of the United States Army. As the district court noted, appellant's actions in intentionally diverting government property directly affected the public, since "misappropriation of government facilities constitutes a misuse of taxpayer's money.... To forestall future abuses, the public has an interest in any deterrent effect disclosure might provide." We also agree with the district court that deletion from the press release of personal references to Cochran (or other identifying information) was not required, since deletion of such information would greatly reduce the deterrence value served by disclosure of the information.[9]
 
 
 31
 The fact that the misappropriation in the present case involved a relatively small amount of money is immaterial to the issue of disclosure: information relating to a misappropriation of government funds, in whatever amount, by a high level government official qualifies as a textbook example of information the FOIA would require to be disclosed to the press. The disclosure of information as to Cochran's military disciplinary proceeding through the July 8th press release did not constitute a "clearly unwarranted invasion" of appellant's privacy.
 
 C. Lack of Written FOIA Request
 
 32
 The FOIA requires each federal agency to publish regulations detailing the procedures to be followed for obtaining records under the Act. See 5 U.S.C. Sec. 552(a)(2), (3), (4)(A). Army regulations require that a FOIA information request be in writing. 32 C.F.R. Sec. 518.4(d).[10] In the instant case it is undisputed that there was no written FOIA request for the information disclosed in the July 8th press release. However, six local media representatives had lodged oral inquiries into the Cochran investigation with Fort Stewart.
 
 
 33
 As the previous discussion indicates, the proper balancing between the Privacy Act and the FOIA, two statutes between which there is great tension, did occur in the present case. The public was given the information, through responsible disclosure by the government and reporting by the press, which Congress intended that it be given and which it was entitled to have under the two statutes. The proper result, as to the disclosure of the information under the FOIA exemption six balancing test, did occur.
 
 
 34
 Therefore, the issue in the present case boils down to this: where a government agency (in this case, the Department of the Army) has responded properly, pursuant to the FOIA balancing analysis, to longstanding oral requests of the media for information which, under the law, is and ought to be available to the media and public, may the subject of the information (Major General Cochran, who had been the subject of rumors of misconduct far beyond that contained in the information disclosed) maintain a Privacy Act action for damages against the agency merely because the agency informations officer (the Fort Stewart Public Affairs Officer) failed to realize that the longstanding requests had not been put into writing as required by agency regulations? We think not.
 
 
 35
 To maintain a Privacy Act claim under section 552a(b), appellant must show that he was "adversely affected" by the Army's failure to comply with a provision of the Privacy Act or rules promulgated under it. 5 U.S.C. Sec. 552a(g)(1)(D). Here, the evidence affirmatively shows that there was no substantive violation of the Privacy Act: the disclosure of information as to appellant's Article 15 disciplinary proceedings, in response to media requests for the information, was entirely appropriate under the FOIA balancing standard.[11] Nor has appellant alleged any violation of Army regulations implementing the Privacy Act. The only "violation" shown by appellant is the failure of the Army informations officer to comply with an Army regulation promulgated under FOIA (not the Privacy Act) requiring written FOIA requests. Appellant would have us infer from this that the disclosure of information was not "required under the FOIA," and thus that subsection (b) of the Privacy Act was violated. We do not agree. First, the Privacy Act does not provide a civil remedy for a violation of regulations promulgated under FOIA. Further, appellant has suffered no "adverse effect" from the Army's failure to comply with its regulation requiring written FOIA requests.[12] This regulation was implemented to benefit the Department of the Army and persons requesting FOIA information from that agency by establishing an orderly procedure for processing FOIA requests and by providing a written agency record of the request. It was not intended to, and does not, create any additional Privacy Act or FOIA rights or protections in persons who are the subject of agency information. The mere oversight of the agency's informations officer in failing to ensure that the proper requesting papers were filed, without more, does not constitute a FOIA or Privacy Act violation and cannot entitle appellant to maintain a Privacy Act claim and collect damages.[13] To hold otherwise under the circumstances of this case would be to exalt form over substance.[14]
 
 
 36
 Accordingly, we hold that, at least under the circumstances of the present case, an agency's mere failure to obtain a written FOIA request before issuing a press release to members of the press who had orally requested such information does not entitle appellant to maintain a claim under the Privacy Act, where the disclosure of the information was otherwise appropriate and proper under the balance established between the Privacy Act and the FOIA.[15] The district court's grant of summary judgment in favor of appellees is
 
 
 37
 AFFIRMED.
 
 
 
 *
 Honorable Virgil Pittman, U.S. District Judge for the Southern District of Alabama, sitting by designation
 
 
 [1]
 That release provided that:
 The DA IG is investigating administrative procedures concerning the way we do business here at Ft. Stewart. If there are some deficiencies, they must be classified as minor. Several people stationed here at Stewart have been questioned, including the former post commander, MG Frank Cochran. In my view nothing earthshaking will come out of this. We are talking basically administrative matters, not major problems of any kind.
 I have not been informed of the details. No conclusions have been reached by TIG. This is a common occurrence. When anyone in the Army thinks something might be wrong, he can go to the IG and tell him. TIG investigates; he often finds that there is nothing substantially wrong.
 
 
 [2]
 The July 8 press release stated that:
 Major General James F. Cochran, former commander of the 24th Infantry Division and Fort Stewart, Georgia, has been officially reprimanded and fined $2000 for two incidents of misuse of government resources during his tour at the post.
 The reprimand and fine were imposed by General Robert M. Shoemaker, Commander, U.S. Army Forces Command, Fort McPherson, Georgia.
 Investigation revealed that, in March, government facilities, property and manpower were used for the repair of a stove, from Cochran's boat. It was also discovered that Cochran used an Army aircraft for a flight to Newburgh, New York, for his own benefit. The flight took place in late May.
 General Cochran has appeal rights and it is not known at this time if he will exercise them.
 Although he relinquished command of Fort Stewart on 1 June 1981, General Cochran has remained on active duty. He will be retired from active duty on 31 July 1981.
 
 
 [3]
 Six local media representatives had standing queries into the Cochran investigation. Colonel Tocher revealed that the press release was developed to respond to this media interest. Record at 397-98. Lieutenant Colonel Mooney testified at his deposition that the press release was disclosed only to those members of the media who had standing oral inquiries. Record at 359. Appellant has submitted no affidavits or evidence rebutting this evidence
 
 
 [4]
 This list was prepared by General Shoemaker and Colonel Tocher, apparently in response to outstanding media questions that had been received at Fort Stewart. The list indicates the extent of the rumors circulating in the community:
 
 
 [1]
 Was General Cochran forced to retire? Answer: No
 
 
 [2]
 Did General Cochran misuse one million dollars worth of government property? Answer: No. The equipment used was that needed to repair a stove, and one aircraft for a flight to New York
 
 
 [3]
 Did they find an army generator on board Cochran's boat? Answer: No generator was involved in the disciplinary action
 
 
 [4]
 Did CID confiscate his boat? Answer: No
 
 
 [5]
 Was General Cochran arrested? Answer: No
 
 
 [6]
 Was Cochran involved in a black market ring at Stewart, involving the PX? Answer: No
 
 
 [7]
 Who conducted the investigation? Answer: The Department of the Army office of the Inspector General
 
 
 [8]
 Could there still be federal charges? Answer: No. The incidents were internal to the Army. The investigation was conducted by the Army inspector general's office and is complete
 
 
 [9]
 Is there an FBI investigation going on? Answer: Refer question to FBI
 
 
 [10]
 Will this affect General Cochran's retirement? Answer: No. General Cochran will retire from active duty on July 31st
 
 
 [11]
 Was Cochran tried on the charges? Answer: Under the Uniform Code of Military Justice, the commander may opt to impose non-judicial punishment for certain type offenses, under the provisions of Article 15 of the Uniform Code of Military Justice. In view of all facts and circumstances, General Shoemaker exercised this option
 
 
 [5]
 5 U.S.C. Sec. 552a(b) provides:
 (b) Conditions of disclosure--No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be--
 (1) to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties.
 (2) required under section 552 of this title;
 (3) for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;
 (4) to the Bureau of the Census for purposes of planning or carrying out a census or survey or related activity pursuant to the provisions of title 13;
 (5) to a recipient who has provided the agency with advance adequate written assurance that the record will be used solely as a statistical research or reporting record, and the record is to be transferred in a form that is not individually identifiable;
 (6) to the National Archives and Records Administration as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, or for evaluation by the Archivist of the United States or the designee of the Archivist to determine whether the record has such value;
 (7) to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought;
 (8) to a person pursuant to a showing of compelling circumstances affecting the health or safety of an individual if upon such disclosure notification is transmitted to the last known address of such individual;
 (9) to either House of Congress, or, to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee;
 (10) to the Comptroller General, or any of his authorized representatives, in the course of the performance of the duties of the General Accounting Office;
 (11) pursuant to the order of a court of competent jurisdiction; or
 (12) to a consumer reporting agency in accordance with section 3711(f) of title 31.
 
 
 [6]
 5 U.S.C. Sec. 552(b)(6)--one of the statutory exemptions to mandatory disclosure required by the FOIA--provides that the FOIA does not apply to matters that are "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."
 
 
 [7]
 The FOIA exception to the Privacy Act was included in the Privacy Act "to meet the objections of press and media representatives that the statutory [FOIA] right of access to public records and the right to disclosure of government information might be defeated if such restrictions [Privacy Act prohibitions on disclosure] were to be placed on the public and press." S.Rep. No. 1183 at 70, reprinted in 1974 U.S.Code Cong. & Ad.News at 6985. The exception was originally included only in the Senate version of the bill, which read "[the provisions of the bill prohibiting disclosure] shall not apply when disclosure would be required or permitted pursuant to ... the [FOIA]." S.2318 as reported from the Committee on Government Operations at 43, reprinted in Source Book at 139 (emphasis added). A compromise amendment added to the House bill which became the Privacy Act included the final language as to the FOIA exception. The report accompanying the compromise bill notes:
 The compromise amendment ... prohibits disclosure without written request of an individual unless disclosure of the record would be pursuant to Section 552 of the Freedom of Information Act. This compromise is designed to preserve the status quo as interpreted by the courts regarding the disclosure of personal information under that section.
 Analysis of House & Senate Compromise Amendments to the Personal Privacy Act, Source Book at 989; see Porter v. United States Department of Justice, 717 F.2d 787, 797-98 (3d Cir.1983).
 
 
 [8]
 We need not determine whether the proper standard of review of the district court's application of the balancing test is de novo or abuse of discretion, since it would have no effect on the result in the present case. Since the facts of the case are undisputed and the only issue is the proper balance under FOIA exemption six, the "clearly erroneous" standard employed in Chilivis v. Securities & Exchange Commission, 673 F.2d 1205, 1210 (11th Cir.1982) and Stephenson v. Internal Revenue Service, 629 F.2d 1140, 1144 (5th Cir.1980), is inappropriate
 
 
 [9]
 In Department of Air Force v. Rose, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), the Supreme Court affirmed an order requiring disclosure of records regarding disciplinary proceedings instituted against young Air Force cadets for violations of the Air Force Honor Code, from which records all personal references and other identifying information were deleted
 Appellant contends that, under Rose, disclosure of the results of military disciplinary procedures is per se a clearly unwarranted invasion of privacy unless the personal references and identifying information are deleted from the disclosure. We disagree. While deletion of indentifying information may often provide a workable compromise between an individual's privacy right and the public's right to know, such deletion is inappropriate in the case of a high-ranking government official who has misappropriated government facilities. In this situation, identifying information is crucial to the public's interest in holding such officials accountable to the public and deterring others from similar behavior.
 
 
 [10]
 32 C.F.R. Sec. 518.4(d) (1984) provides, in relevant part:
 (1) The 10-day period prescribed for review of initial requests under the FOIA (5 U.S.C. 552(a)(6)) starts only when the request--
 (i) Is in writing;
 (ii) Reasonably describes the record requested;
 (iii) Does not fall in a category in Sec. 518.4(j) with regard to fees; and
 (iv) Is received by the proper official as designated in the AR (App. B).
 (2) All requests should refer explicitly or implicitly to the Freedom of Information Act.
 
 
 [11]
 A new provision in the Army regulations, promulgated subsequently to the occurrence of the events in this case, indicates the appropriateness of disclosure of information to the press in situations such as the present
 In order that the public may have timely information concerning [Department of Defense] activities, records requested through public information channels by news media representatives that would not be withheld if requested under the FOIA should be released upon request. Prompt responses to requests for information from news media representatives should be encouraged to eliminate the need for these requesters to invoke the provisions of the FOIA and thereby assist in providing timely information to the public.
 
 
 [32]
 C.F.R. Sec. 518.2(a) (1984)
 
 
 [12]
 This is not to say that no harm has resulted from the officer's having overlooked the regulation. Harm has been suffered by the Department of the Army, the federal courts, and the attorneys who have worked countless hours to resolve the issues raised in this case. The proper remedy for the problem is to discipline or more thoroughly instruct agency information officers as to their regulatory duties
 
 
 [13]
 We distinguish subsection (b)(7) of the Privacy Act, which expressly requires a written request before an agency discloses personal information for law enforcement purposes. In that situation, failure to obtain a written request might constitute a Privacy Act violation. In the present case, nothing in the Privacy Act or Army regulations promulgated under it requires a written request before disclosure of the information
 
 
 [14]
 Two cases have held that a FOIA request is necessary before the FOIA exception to the Privacy Act is applicable. In Bartel v. Federal Aviation Administration, 725 F.2d 1403 (D.C.Cir.1984), plaintiff, a former FAA safety inspector, brought a Privacy Act action on the grounds that his FAA supervisor had sent letters to three FAA inspectors whose personnel records plaintiff had previously obtained (while he was considering filing an Equal Employment Opportunity discrimination complaint), which letters stated that plaintiff had improperly obtained the records in an apparent violation of the Privacy Act. Plaintiff claimed to have lost two government employment opportunities as a result of the letters. The defendants argued that the letters did not violate the Privacy Act in that they only imparted information that the FAA would have been required to release pursuant to FOIA request. Id. at 1411. The District of Columbia Circuit Court of Appeals held that the FOIA exception to the Privacy Act is applicable only "when the agency is faced with a FOIA request for information that is not within a FOIA exemption, and therefore has no discretion but to disclose the information." Id. at 1412
 In Zeller v. United States, 467 F.Supp. 487 (E.D.N.Y.1979), plaintiff was a broker of chartered bus tours who was operating without the required ICC license. After a fatal accident on a charter tour arranged by plaintiff, the ICC commenced a civil action which resulted in a consent judgment restraining plaintiff from operating without a license. The ICC issued a press release describing the consent judgment, which included mention of the fatal bus tour. Over three years later, an ICC supervisor gave copies of the press release to two prospective applicants for broker's licenses, as a warning of what could result from operating without a license. Plaintiff sued, alleging that the supervisor's disclosure of the press release violated subsection (b) of the Privacy Act. The court stated that:
 Plaintiff does not dispute that initially the press release, assuming its accuracy, was information properly released to the public. His complaint is against voluntary re-release, four years later, of stale information, on the theory, urged by defendants, that its disclosure is "required" by the FOIA. However, nothing in the FOIA appears to require such information to be released in the absence of a request therefore. (Footnote omitted).
 Our present decision does not contradict the decisions in Bartel and Zeller. Those cases involved situations where information was gratuitously disclosed without any kind of request for the information. In contrast, the media representatives in the present case had lodged standing oral inquiries for information relating to the Cochran investigation. Furthermore, the present case involves dissemination of current, newsworthy information to members of the press, as opposed to disclosure of stale personal information to purely private individuals. In fact, we read Zeller as expressly permitting the dissemination of current newsworthy information through agency press releases.
 See also Jafari v. Department of Navy, 728 F.2d 247 (4th Cir.1984), where the Fourth Circuit upheld the disclosure of information requested by plaintiff's civilian employer as to plaintiff's attendance at various reserve drills, which request was apparently submitted only by phone; and Florida Medical Association, Inc. v. Department of Health, Education & Welfare, 479 F.Supp. 1291, 1301 (M.D.Fla.1979), where the court stated:
 That the FOIA is exclusively a statute of sweeping, mandatory disclosure is by now beyond question. Therefore, despite the absence of a particular requester under the FOIA for the information at issue in the present case, unless the disclosure of that information falls within the scope of one of the FOIA's exemptions, it may not be prohibited. (Citations omitted).
 
 
 [15]
 As an aside, it might be questioned whether current newsworthy information of interest to the community, such as contained in the press release at issue in the present case, even falls within the strictures of the Privacy Act. As the legislative history indicates, the Privacy Act was primarily concerned with the protection of individuals against the release of stale personal information contained in government computer files to other government agencies or private persons. See supra at 958. The legislative history of the Act does not evidence any intent to prevent the disclosure by the government to the press of current, newsworthy information of importance and interest to a large number of people. Furthermore, there is a great public interest in insuring the dissemination of current, newsworthy information by the press, particularly when the information relates to the operations of government. See e.g., Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936) (need to preserve "untrammeled press as a vital source of public information in order to shed light on public and business affairs of nation and restrain misgovernment"); International News Service v. Associated Press, 248 U.S. 215, 234-35, 39 S.Ct. 68, 70-71, 63 L.Ed. 211 (1918) (news of current events ordinarily regarded as common property); Herbert v. Lando, 568 F.2d 974, 976 (2d Cir.1977), rev'd on other grounds, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) ("the dissemination of news has long been accorded constitutional protection"); see also Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 491-92, 95 S.Ct. 1029, 1044-45, 43 L.Ed.2d 328 (1975) (our society "relies necessarily upon the press to bring to [us] in convenient form the facts of [government] operations"); Mills v. Alabama, 384 U.S. 214, 219, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966) ("the press serves and was designed to serve as a powerful antidote to any abuses of power by government officials"). We do not need to reach this intriguing question in view of our resolution of the present case