Mary Louise CUMMINGS, Plaintiff,

v.

**DEPARTMENT OF THE NAVY, Defendant.**

No. Civ.A. 98–1183(JHG).

United States District Court,
District of Columbia.

Sept. 6, 2000.

Eugene R. Fidell, David Patrick Sheldon, Feldesman, Tucker, Leifer, Fidell & Bank, LLP, Washington, DC, for Mary Louise Cummings, plaintiff.

Mark E. Nagle, Wilma Antoinette Lewis, Meredith Manning, U.S. Attorney's Office, Washington, DC, for Department of Navy, federal defendant.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

The defendant in this case, the Department of the Navy ("Navy"), has filed both a motion to dismiss and a motion for summary judgment. In a previous Order, the Court denied the motion to dismiss without prejudice, and elected to address the arguments from both the motion to dismiss and the motion for summary judgement in one Order.

Ms. Cummings[1] alleges that the Navy violated the Privacy Act, 5 U.S.C. § 552a (1996), by releasing to an author, Robert Gandt, a copy of a Field Naval Aviator Evaluation Board ("FNAEB") report evaluating Ms. Cummings' flying abilities and potential. The Navy has moved to dismiss on the grounds that. the *Feres* doctrine bars Ms. Cummings' claim. *See Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Because the Court finds that Ms. Cummings' suit is barred under the *Feres* doctrine, it is unnecessary to reach the arguments in the defendant's motion for summary judgment, and the motion to dismiss is granted.

## I. FACTUAL BACKGROUND

Ms. Cummings attended the United States Naval Academy, completed her flight training and became a Naval aviator, and received her Master of Science degree from the Naval Post–Graduate School in 1994.[2] She was assigned to the VFA–106 squadron at Naval Air Station Cecil Field, in Jacksonville, Florida, and began training on the Strike Fighter Attack 18 ("F/A–18"), or "Hornet" aircraft, in November 1994. About seven months after Ms. Cummings Hornet training began, the Navy convened a FNAEB to evaluate Ms. Cummings's abilities. The FNAEB heard testimony and reviewed the records of four training flights involving Ms. Cummings. The FNAEB issued a report with findings of fact, conclusions, and recommendations, and also included the record of an earlier "JAGMAN" (Manual of the Judge Advocate General) investigation. The Board recommended that the Navy terminate Ms. Cummings' flying status, and revoke with prejudice her right to wear her aviators wings.[3] However, Ms. Cummings' commanding officer, Captain Moffit, recommended instead that she retain her flight status and be transferred to a different administrative command. Vice Admi-

1. The plaintiff refers to herself as "Ms. Cummings" rather than "LT Cummings" in her papers, and the Court defers to the plaintiff's preference.

2. Because the Court does not reach the motion for summary judgment, the "facts" are drawn from the allegations in the Complaint, and do not include information from the statements submitted in connection with the motion for summary judgment, or the opposition thereto.

3. The specific findings of fact and basis for the recommendation to terminate Ms. Cummings flight status are not relevant to the motions presently at issue.

ral Allen, the Commander of the Navy's U.S. Atlantic Fleet, also rejected the Board's analysis. He directed Ms. Cummings to retain her flight status and resume Hornet training under the same command.[4]

While Ms. Cummings was training on the Hornet aircraft, the Navy permitted Mr. Gandt to observe VFA–106 training at Cecil Field so that he could research a book he planned to write about the training of fighter pilots at Cecil Field. According to the plaintiff, Vice Admiral Allen "allowed Gandt to follow specific squadron personnel without their knowledge as they proceeded throughout the F/A–18 training program." Complaint at para. 13.

In June 1997 Mr. Gandt published "Bogeys and Bandits: Making of a Fighter Pilot." Ms. Cummings alleges that this book was based on Mr. Gandt's observations at Cecil Field and the information the Navy supplied to him, and that one of the characters appearing in his book, by the name of "Sally Hopkins," portrays her. The book includes specific details from her FNAEB report, including direct quotations from various sections of the report. Ms. Cummings alleges that as a result of the publication of Mr. Gandt's book, "her military and civilian career prospects have been severely damaged, and she has suffered severe mental distress, embarrassment, and humiliation, both personally and professionally." Complaint at para. 65

## II. The Motion to Dismiss

■ The Navy has moved to dismiss the complaint on the grounds that the *Feres* doctrine bars the claim.[5] The Court must undertake a two-part analysis, first determining whether or not the *Feres* doctrine applies to a cause of action under the Privacy Act. If *Feres* is applicable, the next step is to apply *Feres'* "incident to service" test. *See, e.g., United States v. Stanley,* 483 U.S. 669, 683, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987).

### A. Applicability of *Feres*

#### i. Background of the Feres Doctrine

*Feres* involved a claim brought by the executrix of a military serviceman who

---

4. In fact, Ms. Cummings did not resume training at that time because she was medically unfit.

5. In its motion to dismiss, the Navy also argues that the Privacy Act does not apply to members of the armed services. The Act applies to "agencies," defined as "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." 5 U.S.C. § 552(f). The Navy argues that "military department" refers only to civilian employees of the military branches. *See Gonzalez v. Dep't of the Army,* 718 F.2d 926, 928 (9th Cir.1983) (for the purposes of Title VII, "armed forces" includes uniformed military personnel, but "military departments" includes only civilian employees). However, in the Privacy Act "agency" means only the entities responsible for complying with the Act. Any "individual" may bring a civil action against an agency. *See, e.g.,* 5 U.S.C. § 552a(g)(1). Further, certain provisions of the Privacy Act suggest that Congress intended uniformed personnel to be protected. For example, one provision specifically exempts "investigatory material com-

piled solely for the purpose of determining suitability, eligibility, or qualifications for ... military service." *See* 5 U.S.C. § 552a(k)(5); *see also* § 552a(k)(7) (exempting "evaluation material used to determine potential for promotion in the armed services"). These exemptions would be unnecessary if military servicepersons were excluded from the Privacy Act altogether. It is also noteworthy that the authors of these sections of the Act were apparently concerned with the potential interest uniformed military personnel would have in this information under the Privacy Act. *See* Legislative History of the Privacy Act of 1974, p. 332 "Additional Views of Hon. John N. Erlenborn" (proposing two amendments which were largely incorporated in § 552a(k), in order to prevent problems that might arise if examinations for eligibility and ratings for military placement, as well as civil service, were made public). Finally, this is by no means the first time a member of the armed forces has brought a Privacy Act claim against the military. *See, e.g., Diederich v. Dep't of the Army,* 878 F.2d 646 (2d Cir.1989); *Cochran v. United States,* 770 F.2d 949 (11th Cir.1985). The Court concludes that Congress intended the term "agency" to encompass the military departments in their oversight of both military and civilian personnel.

died while on active duty, due to a fire in his barracks. The claim was brought pursuant to the Federal Tort Claims Act (FTCA), which waives sovereign immunity in order to allow tort claims to be brought against the government. The military was explicitly included as one of the agencies subject to the FTCA. *See* 28 U.S.C. § 1346(b) & § 2671 (1994) (defining government agencies and employees covered by the FTCA as including military departments and members of the military and naval forces). On its face, the FTCA appears to waive sovereign immunity for actions by military personnel. *See Stanley,* 483 U.S. at 681–82, 107 S.Ct. 3054 (describing the FTCA as "an explicit congressional authorization for judicial involvement that was, on its face, unqualified").

■ Nonetheless, *Feres* held that the plaintiff had not brought a claim recognizable in law. The Court noted that service-connected injuries had not been actionable before, and refused to "impute to Congress such a radical departure from established law in the absence of express congressional command." *Feres,* 340 U.S. at 146, 71 S.Ct. 153. The Supreme Court determined that the government is not liable under the FTCA for "injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Feres,* 340 U.S. at 141 & 146, 71 S.Ct. 153. That formulation became known as the "incident to service" test, or the *Feres* doctrine. The reasoning behind *Feres* is 1) the "distinctively federal" relationship between the government and members of the armed forces and the concern that the location of the injury would arbitrarily cause a state's tort law to govern a soldier's lawsuit; 2) the alternative sources of compensation available to members of the armed forces; and 3) "the peculiar and special relationship of the soldier to his superiors, and the effects of the maintenance of such suits on discipline." *Chappell v. Wallace,* 462 U.S. 296, 299, 103

S.Ct. 2362, 76 L.Ed.2d 586 (1983) (quoting *United States v. Brown,* 348 U.S. 110, 112, 75 S.Ct. 141, 99 L.Ed. 139 (1954)). The third factor became the dominant justification for the *Feres* doctrine. *See Hunt v. United States,* 636 F.2d 580, 599 (D.C.Cir. 1980); *Lombard v. United States,* 690 F.2d 215, 229 (D.C.Cir.1982).

The soundness of the Feres doctrine has been repeatedly questioned, *see, e.g., Lombard* 690 F.2d at 229 n. 7; *United States v. Johnson,* 481 U.S. 681, 700, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987) (Scalia, J., dissenting) ("Feres was wrongly decided and heartily deserves the 'widespread, almost universal criticism' it has received") (internal citations · omitted). Despite the occasional criticism, with which this Court agrees, the *Feres* doctrine not only remains the law for actions pursuant to the FTCA, it has been expanded beyond the context of the FTCA. In *Chappell* the Court found that the rationale behind *Feres* applied to the nonstatutory damage remedy recognized in *Bivens* actions. *See Chappell,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586; *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The *Feres* doctrine has been applied to other constitutional torts and to civil rights statutes. *See, e.g., Bois v. Marsh,* 801 F.2d 462 (D.C.Cir.1986) (42 U.S.C. § 1985 action); *Verma v. United States,* 19 F.3d 646 (D.C.Cir.1994) (due process and just compensation claims based on the Fifth Amendment); *Brown v. United States,* 739 F.2d 362 (8th Cir.1984) (claims based on FTCA and 42 U.S.C. §§ 1981 & 1983, as well as due process and equal protection).

■ No court has yet provided an analysis of whether or not *Feres* should apply to actions under the Privacy Act, although a few courts have apparently presumed that the *Feres* doctrine would operate in that context. For example, in *Uhl v. Swanstrom,* 79 F.3d 751 (8th Cir.1996), the plaintiff was a former Air National Guard officer who brought claims pursuant to the FTCA, 42 U.S.C. § 1983, and the Privacy

Act. The district court had held first that the Privacy Act claim was barred by the statute of limitations, and then went on to hold that each claim was "non-justiciable under Feres." *See Uhl,* 876 F.Supp. 1545, 1561 & 1570 (N.D.Iowa 1995). The district court did not discuss whether or not *Feres* had traditionally been applied to Privacy Act cases, but instead appeared to use the "incident to service" test as "the test for determining the applicability of Feres." *Id.* at 1563.[6] In affirming, Eighth Circuit did not draw a distinction between the application of *Feres* to the FTCA, 1983, and Privacy Act claims. In *Britt v. Naval Investigative Service,* 1987 WL 13681 (E.D.Pa.1987), the court was confronted with both *Bivens* and Privacy Act claims. The court relied on Supreme Court precedent holding *Feres* applicable to *Bivens* type actions, but applied *Feres* to both types of claims without acknowledging that the Court had not addressed the applicability of the *Feres* doctrine in the context of the Privacy Act. Finally, in *Aviles v. United States,* 696 F.Supp. 217 (E.D.La. 1988), the plaintiff brought suit against the United States and individual Coast Guard officers alleging several causes of action, including constitutional tort, FTCA, Rehabilitation Act (29 U.S.C. § 794), and Privacy Act claims. The court dismissed all of the claims, specifically disposing of the Rehabilitation Act claim based on lack of standing, and the FTCA and constitutional tort claims under the *Feres* doctrine.[7] The court did not specifically discuss the Privacy Act claim, but in concluding held that all "damage claims against the United States" were barred under the *Feres* doctrine, and all "claims for equitable relief" were dismissed for lack of standing. Based on the facts of the case, it seems likely that the Privacy Act claim was a claim for damages, and therefore among the claims barred under *Feres.*

■ *Feres* was decided in the context of the FTCA, and although it has subsequently been expanded beyond the context of the FTCA, it should not be routinely applied to every action involving a claim against the government brought by military personnel. In *Hunt,* 636 F.2d 580 (D.C.Cir.1980), our Circuit considered whether or not to extend *Feres* to the Swine Flu Act, and the court's approach in that case is informative. The Swine Flu Act did not create a new substantive cause of action, it merely substituted the government as the defendant where the plaintiff would have had a tort claim against a vaccine manufacturer. *Id.* at 595. The court considered the basic scheme and intent of the Swine Flu Act and the policies supporting the *Feres* doctrine, focusing on the need to protect military discipline. The court found that liability under the Swine Flu Act did not implicate military discipline, thus the *Feres* doctrine had no application to claims under that Act. In the next two sections the Court will consider whether the basic scheme of the Privacy Act implicates the *Feres* doctrine, and then examine the reasons underlying *Feres,* in the context of the Privacy Act.

*ii. Basic Scheme and Intent of the Privacy Act*

If the Privacy Act is similar in structure and intent to the FTCA, which was at issue in *Feres,* it follows that the *Feres* doctrine should be applicable to the Privacy Act as well. The basic purpose of the two statutes differs, in that the Privacy Act creates new, substantive causes of action while the FTCA merely waives sovereign immunity for tort actions.[8] The

---

6. The question of whether *Feres* is generally applicable to a statute is an "entirely different inquiry" from the actual application of the doctrine in a specific case. *Hunt,* 636 F.2d at 599 n. 51.

7. The court actually dismissed the constitutional claims "for lack of a *Bivens* remedy,"
but did so by applying a test identical to the *Feres* doctrine.

8. Ms. Cummings argues that this also distinguishes the Privacy Act from the types of actions *Feres* has been extended to include. For example, 42 U.S.C. § 1985 does not establish new rights, it merely provides a remedy for violations of constitutional rights.

Privacy Act establishes requirements and restrictions regarding the manner in which agencies maintain, provide access to, and ensure confidentiality of, certain of their records, and permits private causes of action as a method of enforcement.

The structure of the Privacy Act is similar to the FTCA, at least in terms of how it extends its coverage to the military. As discussed in the previous section, the FTCA specifically includes the military in its definition of agencies subject to its control. Similarly, the Privacy Act defines "agency" by referencing the Freedom of Information Act (FOIA), which defines agency as including military departments. 5 U.S.C. § 552(f). The Privacy Act permits any "individual" to bring an action [9] without explicitly excluding or including military personnel, but contains provisions which suggest that Congress envisioned military personnel might bring suit under the Act. *See* note 4, *infra.* The Act exempts a variety of records from its requirements, but does not explicitly exclude injuries "incident to military service" from its protection. On its face, the Privacy Act would appear to permit actions brought by military personnel in the same manner that it would permit actions by any other individual. However, it must be remembered that, on its face, the FTCA appeared to permit suits by military personnel as well. Further, the Privacy Act was enacted once the *Feres* doctrine was in place, yet does not specifically exempt the causes of action it creates from the effects of *Feres.*

■ The Privacy Act could be read to permit suits by military personnel. However, in applying *Feres* and *Chappell,* our Circuit has made it clear that those cases "counsel against an expansive interpretation of another remedial statute so as to encompass the military." *See Bois,* 801

However, 42 U.S.C. § 1981 does create substantive civil rights, and has been held subject to the *Feres* doctrine. *See Brown,* 739 F.2d at 367.

F.2d at 470 n. 13 (applying *Feres* to a suit brought under § 1985). In addition to the specific concerns raised in the context of an intra-military lawsuit, in general "waivers of sovereign immunity must be unequivocally expressed" and narrowly construed. *Dorsey v. Dep't of Labor,* 41 F.3d 1551, 1555 (D.C.Cir.1994) (*quoting Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 95, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990)). In this case, Congress waived sovereign immunity to make the "military departments" subject to the Privacy Act, but that waiver must be narrowly construed. The *Feres* doctrine will apply to the Privacy Act unless the concerns which gave rise to the ruling in *Feres* are simply not presented by the causes of action which Congress established in the Privacy Act.

### iii. The Reasoning Underlying Feres

The most important predicate for the *Feres* doctrine is the need to protect military discipline. The Privacy Act may pose a lesser threat to military discipline than the FTCA because it creates new causes of action instead of exposing the government to a potentially broad variety of suits based on tort claims. The causes of action delineated in the Privacy Act are specific and relatively narrow, and would not give rise to the type of tort lawsuits the *Bois* court feared. *See Bois* at 471 ("Every Marine private suffering the indignities of basic training could threaten his drill sergeant with a tort action."). However, an action pursuant to the Privacy Act would require an inquiry into military decision making. (For example, inquiries into decisions regarding what information to put in the records of service personnel, and to whom to release those records.) The ability of military personnel to sue for their records to be corrected, for access to their records, or, as in this case, for damages due to an alleged breach of the confiden-

9. Assuming, of course, that the individual satisfies the other requirements of that provision (for example, that the agency's failure to comply with the Act has caused an adverse effect on the individual).

tiality of their records, could potentially disrupt "military discipline and effectiveness." *Id.* The *Bois* court's concern that "every time a serviceman were demoted or saddled with less than a perfect performance rating he could resort to the courthouse" could be a very real one if Privacy Act suits were not subject to the *Feres* doctrine. *Id.*

■ However much this Court agrees with Justice Scalia's criticism of the *Feres* doctrine, and despite the inconsistent application of the doctrine to Privacy Act cases, the *Feres* doctrine does apply in the context of the Privacy Act. *But cf. Bigelow v. Department of Defense,* 217 F.3d 875 (D.C.Cir.2000) (granting summary judgment on other grounds, the court did not apply the *Feres* doctrine, although the action was brought by a military service member for damages under the Privacy Act); *Cochran v. United States,* 770 F.2d 949 (11th Cir.1985) (same).[10] The reasons for the creation of the *Feres* doctrine, and for its extension beyond the FTCA, apply in the context of the Privacy Act. The doctrine must therefore be applied to Ms. Cummings' claim.

B. Application of the Incident to Service Test

■ Under the test established in *Feres,* Ms. Cummings' suit is barred if her injury arose out of or was in the course of activity incident to her service in the Navy. *Feres,* 340 U.S. at 146, 71 S.Ct. 153. The Navy focuses the inquiry on the FNAEB proceeding, the resulting report, and the actions taken as a result of that report.[11] Ms. Cummings argues that the Court should look to the more immediate cause

of the injury, the release of the FNAEB report. The plaintiff's position is correct. The release of the report, not the creation or existence of the report, creates a cause of action under the Privacy Act. Creating and maintaining the report is certainly military conduct, but all Privacy Act cases against the military will necessarily involve a record from a military "system of records." *See* 5 U.S.C. § 552a(a)(5). If this Court were to employ the Navy's approach, any actions for damage under the Privacy Act could be considered "incident to service" by virtue of the fact that a military record formed the basis for the action. Instead, the Court focuses her inquiry on whether or not the release of Ms. Cummings' FNAEB report was, in itself, incident to military service.

■ Courts have occasionally permitted a case-by-case inquiry into the rationale behind the *Feres* doctrine, but our Circuit does not. *Compare Brown,* 739 F.2d at 367 (using a two-part analysis examining the relationship between the service member's activity and military service, and whether allowing the litigation to proceed would actually impede military discipline) *with Verma,* 19 F.3d 646. *Verma* makes it clear that if an injury arises incident to service, *Feres* bars the claim even if the reasoning behind *Feres* is not implicated by the particular facts of the case. *See Verma,* 19 F.3d at 648 ("the maxim cessante ratione legis, cessat et ipsa lex ('the reason of the law ceasing, the law itself also ceases') is a lure to be resisted when the desired effect of a doctrine will fail without rigid application—without the ruleness of a rule of law"). Beyond ad-

10. As the Navy suggests, failure to raise the doctrine as a defense in prior suits does not prevent the defendant from arguing that *Feres* applies in this case.

11. The Navy does not argue that the release of the report should not be part of the inquiry, but argues that the injury was incident to service because Ms. Cummings was on active duty during the incidents evaluated by the FNAEB, the FNAEB was convened in accordance with Navy regulations, and Ms. Cum-

mings' status was reviewed by her commanding officers during, and subsequent to, the FNAEB. The Navy indicates that the dispute involves "(1) the actions of Navy officers; (2) criticisms of the FNAEB by the Admiral and commanders under him to their subordinates; (3) an investigation into Navy officers' conduct; and (4) challenges regarding the investigation into and report of her flying qualifications." Motion to Dismiss at 13. The Navy's focus is on the FNAEB process itself, as opposed to the release of the FNAEB report.

monishing courts to adhere strictly to the doctrine, the cases in our Circuit provide little guidance regarding how to apply the "incident to service" test.

Some courts interpret the "incident to service" test in an extremely expansive manner. For example, the Feres doctrine has been said to bar "practically any suit that implicates military judgments and decisions." *Persons v. United States*, 925 F.2d 292, 295 (9th Cir.1991). The doctrine "encompass[es], at a minimum, all injuries suffered by military personnel that are even remotely related to the individual's status as a member of the military." *Major v. United States*, 835 F.2d 641, 644-45 (6th cir.1987), *cert. denied*, 487 U.S. 1218, 108 S.Ct. 2871, 101 L.Ed.2d 906 (1988); *see also Hunt*, 636 F.2d at 587 n. 16 ("most lower courts have applied the *Feres* doctrine with a vengeance, rejecting virtually all claims based on injuries suffered while on active-duty status") (citations omitted).

█ The Sixth Circuit has suggested that inquiries into "the location of the event, the status (military or civilian) or the tortfeasor, or any nexus between the injury-producing event and the essential defense/combat purpose of the military activity from which it arose" are unnecessary. *Major*, 835 F.2d at 645. In contrast, other courts employ a "multifactored" approach which requires an analysis of those very issues. For example, the court in *Brown* also examined duty status, location of the injury, and the nature of the tortious behavior. *Brown*, 739 F.2d at 362-68.[12] In this case Ms. Cummings was on active duty during the relevant time frame, and the activity giving rise to injury took place on a military base (that activity being the release of a copy of Ms. Cummings's

record). Both of those factors suggest that her injury was "incident to service."

It is more difficult to ascertain a military purpose which could lead to a decision to release the FNAEB report to a civilian author. Other courts have found similar releases to be "incident to service," although those cases have involved claims which were primarily focused on other matters, with the release of personal information to the public as one merely one count among several. For example, *Britt* involved the investigation of a service person's involvement with a fellow Marine accused of unlawfully obtaining military equipment. The plaintiff alleged injury based on both the investigation itself and the fact that the investigative agents had made copies of the investigative file available to the service person's civilian employer. The court held that all the claims were barred as incident to military service. *See Britt*, 1987 WL 13681 (E.D.Pa. 1987); *see also Aviles*, 696 F.Supp. 217 (mandatory HIV testing resulted in a positive test, forcing service person to retire, and "news of this positive test result" was disseminated, although it is somewhat unclear whether that "dissemination" was part of the injury held "incident to service"); *Uhl* 876 F.Supp. at 1549 (plaintiff alleged deprivation of property interests without due process, wrongful discharge, failure to maintain his military record accurately, the release of information from that record to medical professionals and the press, and intentional interference with contract).

In other contexts courts have held injuries to be "incident to service" where the military activity in question does not have an obvious and direct connection to mili-

---

12. Ms. Cummings urges this Court to employ the approach taken in *Elliott v. United States*, 13 F.3d 1555 (11th Cir.1994). In *Elliott* the court employed a three factor test for determining whether or not an injury arose incident to military service. The factors included the duty status of the plaintiff, the situs of the injury, and "whether the activity from which the injury arose served some military purpose

or mission." *Id.* at 1560-62. However, that opinion was vacated and an *en banc* rehearing granted, *see Elliott*, 28 F.3d 1076, and the district court's opinion was subsequently affirmed by an equally divided court, *Elliott*, 37 F.3d 617. Because the discussion of the three factors was part of the vacated opinion, the Court declines to rely on that particular analysis.

tary goals. For example, in *Hass v. United States,* 518 F.2d 1138 (4th Cir.1975), an accident arising from a service member's use of a horse stable operated by the government for the benefit of service personnel was "incident to service." In another case, a service person was struck and killed by a drunk driver (a noncommissioned officer) on a military base, where the driver had been at a party in his company barracks. *See Major,* 835 F.2d at 642. In *Corey v. United States* the Tenth Circuit held that an officer's sexual assault on the plaintiff was "incident to service" because the incident happened at a party arranged by air force personnel at a base in Turkey, the plaintiff's voluntary attendance was a consequence of her military service, and those participating in the party were subject to military discipline and control. 1997 WL 474521 (Aug. 20 1997), *cert. denied* 522 U.S. 1081, 118 S.Ct. 865, 139 L.Ed.2d 763 (1998).

Ms. Cummings attempts to analogize the facts of this case with those in *Lutz v. Secretary of the Air Force,* 944 F.2d 1477 (9th Cir.1991), where the court held that an injury had not arisen "incident to service." In that case, three service personnel subordinate to the plaintiff broke into the plaintiff's office, stole personal papers, and distributed them to other military personnel. In contrast, Ms. Cummings does not allege that a rogue actor broke in and stole her FNAEB report, and in fact makes no specific allegations regarding who mailed the FNAEB. In her complaint Ms. Cummings alleges that the FNAEB report was maintained by the Navy in her official Flight Training Jacket, and to show that the Navy released it she relies on the general allegation that "upon information and belief, one or more naval officers, enlisted personnel, and/or civilian employees of the Department of the Navy

provided these details to Gandt, as well as the written record of the FNAEB testimony, Flight Grade Sheets and related documents."

Ms. Cummings' case is reliant on the premise that a factfinder could infer from the Navy's control and custody of her record that Navy personnel released her record. As Ms. Cummings puts it, "this case is about the unilateral release of confidential and private documents by Naval personnel." Opp. to Motion to Dismiss at 21. That release was a military decision, regardless of how unlikely or outrageous the decision might appear to a casual observer.[13] The Navy had already decided to grant Mr. Gandt a considerable amount of access to training operations at Cecil Field. If a Navy service member with access to FNAEB records decided to give Mr. Gandt still more information, that decision was related to the policy the Navy had already established toward Mr. Gandt.

Ms. Cummings' claim arose from the Navy's alleged "unilateral release" of the FNAEB report. That release took place incident to Ms. Cummings' service in the Navy, and Ms. Cummings Privacy Act claim is therefore barred.

It is therefore

**ORDERED** that defendant's motion to dismiss is granted; and it is

**FURTHER ORDERED** that defendant's motion for summary judgment is denied as moot.

IT IS SO ORDERED.

---

13. Ms. Cummings argues that the release of her record could not have been a discretionary military decision because such a release would clearly not be permitted under the Privacy Act or military regulations. However, even military decisions which cause clear violations of constitutional rights and are "beyond the bounds of human decency" have been protected under *Feres. Stanley,* 483 U.S. at 708, 107 S.Ct. 3054 (O'Connor, J., concurring in part and dissenting in part) (Justice O'Connor would have held the action not to be "incident to service," but her position did not prevail).