801 F.2d 462
 41 Fair Empl.Prac.Cas. 1247,
41 Empl. Prac. Dec. P 36,651, 255 U.S.App.D.C. 248,
55 USLW 2153
 Captain Joyce L. BOIS, Appellant,
v.
John O. MARSH, Jr., in His Official Capacity as Secretary of
the Army, et al.
Captain Joyce L. BOIS, Appellant,
v.
John O. MARSH, Jr., in His Official Capacity as Secretary of
the Army, et al.
 Nos. 84-5739, 85-5253.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 19, 1986.
Decided Sept. 12, 1986.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action No. 80-01030).
 Peter J. Levin, with whom Thomas S. Warrick and Arthur B. Spitzer, Washington, D.C., were on brief for appellant. Paul Ryberg, Jr., Washington, D.C., also entered an appearance for appellant.
 Scott T. Kragie, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief for appellees.
 Before: WALD, Chief Judge, SCALIA and STARR, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STARR.
 Opinion concurring in part and dissenting in part filed by Chief Judge WALD.
 STARR, Circuit Judge:
 
 
 1
 The consolidated cases before us were instituted by Joyce L. Bois, formerly an active member in the United States Army. An audiologist, Bois alleges that she was severely hampered in her efforts to pursue an Army career by the discriminatory conduct of one of her superiors, Colonel Sedge, and other Army personnel. In a multi-count complaint, Bois asserted claims for declaratory and equitable relief based on alleged violations of due process and equal protection. She also asserted statutory and common-law damage claims against Colonel Sedge in his individual capacity.
 
 
 2
 The District Court dismissed all claims.[1] After careful review, we conclude that Bois's non-monetary claims are unfit for judicial review at this time. We also hold that her claims for damages were properly dismissed on the merits.
 
 
 3
 * In 1977, Bois was commissioned as a First Lieutenant in the Medical Service Corps. After basic training, she was assigned to the Army Audiology and Speech Center ("Center") at Walter Reed Army Medical Center ("Walter Reed"). The Center was supervised by Colonel Sedge. According to the allegations in Bois's complaint, which we accept as true for purposes of our decision, Colonel Sedge harbored animus against women who had chosen to become Army audiologists. As a result, Sedge deliberately failed to provide Bois with sufficient time or training for her adequately to orient herself to her duties. He also subjected her to unwarranted verbal abuse, calling her competence unfairly into question. Soon after Bois arrived at the Center, Sedge ordered her to cease serving as an audiologist and to assume instead a secretarial-receptionist post in the Center's Administrative Section. Eventually, Sedge threatened to have Bois discharged from the Army if she did not either resign or request a transfer to a different line of work.
 
 
 4
 Bois filed a complaint of sex discrimination with the Chief of Walter Reed's Equal Opportunity Office, Major Beale. Major Beale promptly investigated Bois's allegations. His findings support Bois's claims against Sedge. As relevant here, he found (1) that Bois's reassignment as a secretary-receptionist was the result of "sexism," (2) that Bois had been "programmed to fail," and (3) that Bois had not been given an equal opportunity to succeed in her career. Joint Appendix (J.A.) at 224-26.[2] In short, the report concluded that Bois had been the victim of discrimination. Id. Major Beale recommended that Bois be reassigned to another facility for a more objective evaluation of her competency, or that she be reclassified as an administrator at Walter Reed. Id. at 226-27.[3]
 
 
 5
 While Major Beale was conducting his investigation, Bois was transferred to the Ear, Nose and Throat Clinic at Walter Reed, away from the supervision of Colonel Sedge. After a few days, however, she was ordered to return to the Center for a 30-day evaluation by Sedge and others. At the beginning of Bois's evaluation program, Sedge formally proposed that she be dismissed from the Army, again on the ground of her failure to inform the Army that she had not yet received her master's degree when she began work as an audiologist. At the end of this evaluation, Bois was given an administrative assignment elsewhere at Walter Reed.
 
 
 6
 Colonel Sedge's campaign against Bois continued unabated. On July 31, 1978, he prepared a written proposal to dismiss Bois from the Army. J.A. at 238. In August 1978, he participated in the preparation of a highly unfavorable "Officer Efficiency Report (OER)." Bois's immediate supervisor, Captain Kramer, was personally and directly involved in both of those actions.
 
 
 7
 Soon thereafter, however, Captain Kramer filed a statement with the Hospital's Inspector General, alleging that Sedge had pressured him into making false statements in connection with both the recommended dismissal and the OER. Kramer further accused Sedge of actively plotting to ruin Bois's career, and of harboring a discriminatory attitude toward Army women in general and toward Bois in particular. Kramer also recanted the disparaging statements he had made about Bois's performance. J.A. at 257-59.
 
 
 8
 In the wake of these developments, Bois appealed to the next highest officer in her chain of command, Walter Reed's Commander, Major General George Baker. In this appeal, she made five requests: (1) that the evaluation for her trial period be altered to compensate for Sedge's bias; (2) that she be reassigned to another installation for completion of her clinical fellowship; (3) that her Army tour of duty be extended by one year to permit her to gain more experience as an audiologist; (4) that the Army disapprove Sedge's proposals to remove or reclassify her; and (5) that the "flagged" status of her service record, which effectively prevented commendations, promotions, and further schooling, be lifted. J.A. at 279-80. In response, General Baker informed Bois that he had instructed Sedge to withdraw Bois's adverse OER and to submit a new one; that Sedge's discharge action against her had been withdraw; and that the "flagging" action would be purged from her record. Two months later, in accordance with her request for reassignment, Bois was transferred to Fort Hood, Texas, where she served as an audiologist. Her performance there was rated as "outstanding." J.A. at 292.
 
 
 9
 In November 1978, Bois appealed to the Secretary of the Army, contending that the relief granted by General Baker was inadequate. She also complained that the Army's EEO system was inadequate because it did not provide for independent investigations, open hearings with an opportunity for testing of evidence, or written statements of findings. J.A. at 281-82. After further investigations by the Inspector General of the Health Services Command (which has supervisory responsibility for Walter Reed), the Deputy Assistant Secretary of the Army responded to Bois's appeal, (1) stating that the relief granted by General Baker was adequate, and (2) declining Bois's suggested panoply of procedures to be followed in EEO cases on the ground that, in the Army's experience, "grievances can be more expeditiously resolved within the chain of command." J.A. at 289.
 
 
 10
 Just before the expiration of her three-year tour of active duty, Bois applied for a transfer to one of the other military branches, but was told that no positions were available. Bois maintains that this denial was also the result of continued discrimination directed against her. Bois left the Army on January 8, 1981, two months after the expiration of her regular tour of duty.
 
 II
 
 11
 Bois's amended complaint set forth nine counts, three of which are no longer at issue. Of the six counts presently before us, one involved a due process challenge to the Army's grievance procedures. Two counts asserted that Bois had been discriminated against in violation of equal protection guarantees, executive orders and Army regulations. Three counts represented damages claims against Colonel Sedge in his individual capacity, one of which was for conspiracy to deprive Bois of her civil rights in violation of 42 U.S.C. Sec. 1985(3),[4] with the remaining two based on common-law tort theories of interference with prospective advantage and intentional infliction of emotional distress. We first examine Bois's request that the Army be required to grant greater procedural rights to uniformed members who complain of unlawful discrimination.
 
 
 12
 Bois has mounted a sweeping constitutional attack against the Army's grievance procedures. Yet Bois stands in the civil courts as a civilian seeking reform of military procedures to which she is no longer subject. She has voluntarily resigned from the Army and has asserted no intention of returning to active duty.[5] Rather than seeking reinstatement, she represents only that "she [could] still have an interest in making the Army a career" if the procedures of which she complains were changed. J.A. at 306. According to the Army's undisputed assertion, Bois has no present dealings with the Army and from its standpoint will not have a relationship with her in the future unless the Army calls her up for active duty, which could occur only in the event of a national emergency. See Army Brief at 11-12. Because Bois has nothing to gain from the equitable relief she seeks, her claim is moot. See, e.g., Craig v. Boren, 429 U.S. 190, 192, 97 S.Ct. 451, 454, 50 L.Ed.2d 397 (1976).[6]
 
 
 13
 The District Court nonetheless held that Bois's claim for equitable relief was justiciable, concluding that this case calls within the narrow exception to mootness for cases "capable of repetition, yet evading review." The trial court reasoned that "dismissal of cases such as this ... could result in a denial of many service members of the right to challenge the constitutionality" of the Army's procedures. J.A. at 307. We disagree. Under the governing test as set forth in Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975), the "capable of repetition" exception to mootness applies when two specific conditions are met: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." Although the District Court properly concluded that the first condition had been satisfied, it failed even to address the second. Analyzing this latter component of the Weinstein v. Bradford test, we can discern no "reasonable expectation" that Bois will be affected by the Army's grievance procedures again. As in the Rhodes Tavern case, Grano v. Barry, 733 F.2d 164 (D.C.Cir.1984), there are in this case "too many variables to allow a prediction that appellant[ ] will again be subjected to action of this sort." Id. at 167. With respect to Bois, these variables include the likelihood that she will re-enter active service in the Army (either by re-enlisting or by being called up for active duty) and the likelihood that she would again have occasion to employ the challenged procedures if she were to return. The likelihood that these contingencies will occur is too remote to justify judicial review at this time.
 
 III
 
 14
 We turn next to Bois's request for a declaratory judgment that the Army violated her due process and equal protection rights under the Fifth Amendment and applicable executive orders and Army regulations. Bois apparently believes that, although she left military life, a judicial determination that she was discriminated against in the Army and denied a fair opportunity for redress would improve "her professional reputation and career opportunities" in the civilian sector. J.A. at 30 (Second Amended Complaint p 95). She concedes, however, that the only negative evaluation ever included in her military record was voluntarily withdrawn by the Army in response to her charge of discrimination and replaced with an OER that gave her a virtually perfect score. Bois nevertheless contends that judicial relief is necessary to rebut the negative inference employers and others might draw from the indication in her military record that she "received her second OER not in her professional field but as a 'Special Projects Officer.' " Bois's Brief at 29 n. 18.[7]
 
 
 15
 Although Bois now seeks declaratory relief solely to correct her military record, she has to date elected not to seek a remedy from the administrative tribunal expressly designed to hear such claims. Congress has authorized the Army Board for Correction of Military Records "to correct any [Army] record" in order to "remove an injustice." 10 U.S.C. Sec. 1552(a) (1982).[8] The Board, composed of civilians appointed by the Secretary of Army, has authority to consider claims based on "constitutional, statutory and/or regulatory violation," 32 C.F.R. Sec. 581.3(c)(5)(v) (1985), and is required to provide a written statement of reasons for its decision, id. Sec. 581.3(c)(5)(iv), (f)(1)(i)(c ). Bois's claims based on Constitution, executive orders and Army regulations "could readily have been made within the framework of this intramilitary procedure." Chappell v. Wallace, 462 U.S. 296, 303, 103 S.Ct. 2362, 2367, 76 L.Ed.2d 586 (1983); see also Baxter v. Claytor, 652 F.2d 181, 185 & n. 3 (D.C.Cir.1981); Bard v. Seamans, 507 F.2d 765, 769-70 (10th Cir.1974).[9]
 
 
 16
 In view of this procedure, we are persuaded that settled principles of law requiring exhaustion of administrative remedies can and should be applied to Bois's claims for declaratory relief. See generally McKart v. United States, 395 U.S. 185, 193-95, 89 S.Ct. 1657, 1662-63, 23 L.Ed.2d 194 (1969). The judicial intervention that Bois seeks poses a substantial threat to military discipline essential to the effective functioning of our Nation's Armed Forces. See, e.g., Chappel, 462 U.S. at 299-300, 103 S.Ct. at 2365; Stencel Aero Engineering Corp. v. United States, 431 U.S. 666, 671-73, 97 S.Ct. 2054, 2057-59, 52 L.Ed.2d 665 (1977). Permitting Bois to attempt to prove that she was victimized by discrimination would necessarily require a civilian court to examine in detail the personnel and other command decisions which Bois claims were discriminatory. Such scrutiny would also likely require testimony by Army personnel about command decisions by Bois's superiors. Adjudication of her due process attack on Army procedures for handling internal complaints of discrimination would obviously require this court to intrude on the "peculiar and special relationship" of military personnel to their superiors. Stencel, 431 U.S. at 671, 97 S.Ct. at 2057 (quoting United States v. Brown, 348 U.S. 110, 112, 75 S.Ct. 141, 143, 99 L.Ed. 139 (1954)).
 
 
 17
 Although the need for military discipline by no means precludes judicial review of all military matters, the Supreme Court has instructed us that "[c]ivilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers." Chappell, 462 U.S. at 300, 103 S.Ct. at 2366.[10] This teaching reinforces the well-established principle "that a court should not review internal military affairs in the absence of ... exhaustion of available intraservice corrective measures." Mindes v. Seaman, 453 F.2d 197, 201 (5th Cir.1971); see also Sohm v. Fowler, 365 F.2d 915, 917-18 (D.C.Cir.1966); Bolger v. Marshall, 193 F.2d 37, 39 (D.C.Cir.1951).
 
 
 18
 We recognize that the exhaustion doctrine is subject to exceptions, even in the context of suits alleging wrongs suffered incident to military service. The doctrine is not, for example, applied where "exhaustion would in all likelihood be futile," Committee for GI Rights v. Callaway, 518 F.2d 466, 474 n. 20 (D.C.Cir.1975), or where no real possibility of adequate relief exists, Hodges v. Callaway, 499 F.2d 417, 420-21 (5th Cir.1974). But no reason has been advanced to suggest that the Board lacks the power to provide Bois with complete relief or that it would not fairly consider all her claims. To the contrary, it appears that the Board's decision may "obviate the need for judicial intervention." Schlesinger v. Councilman, 420 U.S. 738, 757, 95 S.Ct. 1300, 1312, 43 L.Ed.2d 591 (1975) (citations omitted).[11]
 
 
 19
 In addition, Bois has failed to make "any showing of the requisite irreparable harm that would justify [her] failure to exhaust [the internal military] process before seeking review in the civilian courts." Sisson v. United States, 736 F.2d 1275, 1277 (9th Cir.1984). For example, exhaustion might not be required if Bois were challenging her incarceration by the military or the ongoing deprivation of some other liberty interest. See Schlesinger, 420 U.S. at 759, 95 S.Ct. at 1313; Hayes v. Secretary of Defense, 515 F.2d 668, 674-75 (D.C.Cir.1975). But no such showing of harm has been made here. In sum, we discern no basis for departing from the salutary rule that "an aggrieved military officer must first exhaust his administrative remedies with his particular service's Board for Correction of Military Records prior to litigating his claims in a federal court." Knehans v. Alexander, 566 F.2d 312, 315 (D.C.Cir.1977) (citations omitted), cert. denied, 435 U.S. 995, 98 S.Ct. 1646, 56 L.Ed.2d 83 (1978); see also Hadley v. Secretary of Army, 479 F.Supp. 189, 194 (D.D.C.1979).
 
 IV
 
 20
 Aside from the non-monetary relief sought against the Army, Bois also seeks damages from Colonel Sedge under both 42 U.S.C. Sec. 1985(3) for deprivation of her civil rights and under common-law tort theories. These claims were properly dismissed on the merits.A
 
 
 21
 Only one reported decision has addressed the precise question whether military personnel can seek damages against their supervisors under 42 U.S.C. Sec. 1985(3). See Alvarez v. Wilson, 600 F.Supp. 706, 710-12 (N.D.Ill.1985).[12] That court found controlling the Supreme Court's analysis in holding that intramilitary damages actions were not available under either the Federal Tort Claims Act (FTCA) or the Constitution. We concur in that conclusion.
 
 
 22
 In the leading case of Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 150 (1950), the Supreme Court squarely held that the FTCA should not be interpreted to render the Government liable "for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." 340 U.S. at 146, 71 S.Ct. at 159. The Court was unwilling to impute to Congress the intent to create a damages remedy for service-connected injuries "in the absence of express Congressional command." Id. The Court has since repeatedly reaffirmed Feres, relying primarily on the "peculiar and special relationship of the soldier to his superiors, [and] the effects of the maintenance of such suits on discipline." Brown, 348 U.S. at 112, 75 S.Ct. at 143, quoted in United States v. Muniz, 374 U.S. 150, 162, 83 S.Ct. 1850, 1856, 10 L.Ed.2d 805 (1963), Chappell, 462 U.S. at 299, 103 S.Ct. at 2365, and United States v. Shearer, --- U.S. ----, 105 S.Ct. 3039, 3043, 87 L.Ed.2d 38 (1985); see also Stencel, 431 U.S. at 673, 97 S.Ct. at 2058; Parker v. Levy, 417 U.S. 733, 743-44, 94 S.Ct. 2547 (1974).
 
 
 23
 The Court has also applied the Feres analysis in the context of constitutional tort suits. In Chappel v. Wallace, several minority servicemen brought suit against individual military officers, claiming that the officers had discriminated against them in violation of their constitutional rights. The servicemen asked the Court to craft a BIvens damages remedy, see Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), but the Court ruled that it would be inappropriate for it to imply such a remedy. Relying upon Feres, the Court concluded that the adverse effect on military discipline constituted a "special factor[ ] counselling hesitation" in implying a constitutional remedy that would "expose officers to personal liability at the hands of those they are charged to command." 462 U.S. at 298, 304, 103 S.Ct. at 2364, 2367.
 
 
 24
 The Court's analysis in Feres and Chappell that courts should not imply damage remedies for service-connected injuries is fully applicable to Bois's claim under Sec. 1985(3).[13] Like the FTCA and the Constitution, Section 1985(3) does not expressly authorize such suits. Cf. Mollnow v. Carlton, 716 F.2d 627, 631 (9th Cir.1983), cert. denied, 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 547 (1984). Moreover, "the potential for disruption of 'the unique disciplinary structure of the military establishment,' Chappell v. Wallace, [462 U.S. at 304, 103 S.Ct. at 2367], presented by such suits under Sec. 1985(3) is ... perhaps even greater than that perceived in Feres with respect to suits under the [FTCA]." Alvarez, 600 F.Supp. at 712. Section 1985(3) is a conspiracy statute. Allowing conspiracy claims to proceed would not only entail second guessing of military decisions by civilian courts and require testimony by military personnel about command decisions, it would also tend to pit a plaintiff's superiors against one another. Each officer would doubtless feel pressure to lay the blame for any alleged wrongdoing at the feet of his confreres, lest he be implicated by association in any conspiracy. See Krulewitch v. United States, 336 U.S. 440, 454, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) (Jackson, J., concurring). A risk likewise exists that a subordinate officer may be found to have participated in the conspiracy merely by carrying out orders. Both possibilities would obviously tend to undermine military discipline. In the face of congressional silence, faithful adherence to the Supreme Court's teachings clearly prohibits us from implying an intramilitary damage action under Section 1985(3).[14]
 
 B
 
 25
 The final issue before us is whether Feres also bars Bois's intentional tort claims against her military superiors. Although the precise legal issue addressed in Feres was the extent to which the United States had waived its sovereign immunity in the FTCA, the rationale employed swept more broadly, as the Court has since expressly recognized. See Chappell, 462 U.S. at 299, 103 S.Ct. 2365. Courts have long applied the reasoning in Feres to preclude suits for negligence against individual officers of the United States military. See, e.g., Hass v. United States, 518 F.2d 1138, 1143 (4th Cir.1975); Bailey v. Dequevedo, 375 F.2d 72 (3rd Cir.), cert. denied, 389 U.S. 923, 88 S.Ct. 247, 19 L.Ed.2d 274 (1967); Bailey v. Van Buskirk, 345 F.2d 298 (9th Cir.1965), cert. denied, 383 U.S. 948, 86 S.Ct. 1205, 16 L.Ed.2d 210 (1966). We see no reason to depart from this well-established precedent. As discussed above, Feres and its progeny turned on the need to preserve discipline within our Nation's Armed Forces. As the Supreme Court held in Chappell, subjecting military commanders to personal liability for suits brought by their subordinates poses an equal, if not greater, threat to military discipline as would permitting suits under the FTCA. 462 U.S. at 304, 103 S.Ct. 2367; see also Jaffee v. United States, 663 F.2d 1226, 1234 (3d Cir.1981) (en banc) ("Suits against individuals have a far greater potential for chilling responsible decision-making than those against the government."), cert. denied, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982).
 
 
 26
 Bois nevertheless argues that the policies articulated in Feres and Chappell should be limited to unintentional tort claims. But we, like the Third and Ninth Circuits, can divine no reason why intramilitary suits alleging intentional wrongs would not disrupt military discipline and effectiveness as much as suits alleging negligence. Mollnow, 716 F.2d at 627; Jaffee, 663 F.2d at 1234-35; see also Laswell v. Brown, 683 F.2d 261, 265 (8th Cir.1982), cert. denied, 459 U.S. 1210, 103 S.Ct. 1205, 75 L.Ed.2d 446 (1983); Broudy v. United States, 661 F.2d 125, 127 n. 4 (9th Cir.1981); Thornwell v. United States, 471 F.Supp. 344, 348 (D.D.C.1979); Levin v. United States, 403 F.Supp. 99, 104 (D.Mass.1975); Rotko v. Abrams, 338 F.Supp. 46 (D.Conn.1971), aff'd per curiam, 455 F.2d 992 (2d Cir.1972). Consider the result were courts to allow soldiers to institute tort actions for intentional infliction of emotional distress or interference with prospective advantage. Every Marine private suffering the indignities of basic training could threaten his drill sergeant with a tort action. Similarly, every time a serviceman were demoted or saddled with less than a perfect performance rating he could resort to the courthouse. Such possibilities would plainly weaken the authority of military superiors over their subordinates and would undermine the "special relationship" that Feres and Chappell sought to protect.
 
 
 27
 Moreover, if we adopted the counterintuitive distinction advanced by Bois, "virtually every case for negligence could now be brought successfully through 'scholastic exercises in pleading' with the mere insertion of the words 'intentional negligence.' " Jaffee, 663 F.2d at 1235 (citation omitted). We refuse to create such a broad and unprincipled exception to a policy of restraint that, as the Supreme Court has emphasized time and again, is vital to our Nation's security.
 
 V
 
 28
 The judgments of the District Court are therefore affirmed as to Bois's claims for damages. As to her request for equitable relief, the judgment of the District Court is vacated and the District Court is instructed to dismiss that claim as moot. With respect to Bois's claims for declaratory relief, the judgment of the District Court is vacated and the District Court is ordered to dismiss those claims without prejudice pending exhaustion of her administrative remedies.
 
 
 29
 So Ordered.
 
 
 30
 WALD, Chief Judge, concurring in part, dissenting in part: I join in Parts I, II, III, and IV(B) of the panel's opinion. Because, however, I have grave doubts about too casually advancing the hastening sweep of the Feres doctrine, I dissent from the panel's disposition of petitioner's Sec. 1985(3) claim in Part IV(A).
 
 
 31
 The panel's opinion appears to invert standard principles of clear statement by reading the Feres doctrine as a special rule of statutory construction for all intramilitary lawsuits. Rather than assuming that Congress will state clearly its intention to exclude a specific category of cases from an otherwise broad remedial statute, the panel views Feres as an overarching rule of statutory construction that requires Congress to state clearly its intention to include such cases, even when as with Sec. 1985(3) the statute was passed more than a half century before Feres was decided. I do not read the Feres doctrine, as enunciated by the Supreme Court, to be so omnipotent, and I would wait for that Court to superimpose it upon a congressional enactment that gives no hint it was meant to exclude intramilitary torts.
 
 I.
 
 32
 The so-called Feres doctrine, as it has developed in a series of Supreme Court cases, is not a monolithic preclusion of all intramilitary tort claims. In fact, all of the Feres cases but one have arisen under the Federal Tort Claims Act (FTCA). The exception, Chappell v. Wallace, 462 U.S. 296, 103 S.Ct. at 2362, 76 L.Ed.2d 586 (1983), refused to imply a constitutional tort under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), in an intramilitary setting, and reflects primarily separation of powers concerns about the judiciary usurping Congress' preeminent role in legislatively defining rights and remedies, concerns that are definitely not present in cases involving construction of Congress' own enactments. Barring Sec. 1985(3) remedies to servicepersons is a novel and unprecedented judicial action that must stand on its own.
 
 A.
 
 33
 Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), involved three negligence suits brought by servicepersons against the federal government under the FTCA. In ruling that the FTCA did not authorize such claims, the Court relied on three arguments. First, the Court read the FTCA requirement that "The United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances ...," 28 U.S.C. Sec. 2674, as precluding lawsuits against the government where parallel private law causes of action did not exist. 340 U.S. at 141-42, 71 S.Ct. at 157. The Court viewed the military setting as unique and without a private law analogue.
 
 
 34
 Second, the Court maintained that because servicepersons cannot choose their work location the FTCA's requirement that the cause of action be recognized by "the law of the place where the act or omission occurred," 28 U.S.C. Sec. 1346(b), would visit random and varying outcomes throughout the military for the same kind of conduct. 340 U.S. at 142-44, 71 S.Ct. at 157.
 
 
 35
 Finally, because Congress had already provided "systems of simple, certain, and uniform compensation for injuries or death of those in armed services," 340 U.S. at 144, 71 S.Ct. at 158, the Court interpreted Congress' failure to adjust the FTCA to those systems as evidence that there was "no awareness that the Act might be interpreted to permit recovery for injuries incident to military service." 340 U.S. at 144, 71 S.Ct. at 157.
 
 
 36
 Although early Supreme Court discussions of Feres reiterated these three grounds,[1] a fourth rationale, first enunciated in 1954, has since become the more familiar basis for the doctrine. In United States v. Brown, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954), the Court permitted an FTCA malpractice suit against a Veterans Administration hospital for a non-duty related injury. In distinguishing Feres, the Court explained that there
 
 
 37
 The peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the TCA were allowed for negligent orders given or negligent acts committed in the course of military duty, led the Court to read that Act as excluding claims of that character.
 
 
 38
 348 U.S. at 112, 75 S.Ct. at 143.
 
 
 39
 This latter-day explanation of Feres became the cornerstone of two recent FTCA cases. Although the second and third Feres arguments were reiterated in Stencel Aero Engineering Corp. v. United States, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), disallowing an FTCA indemnification suit by a third party for monies paid to a serviceperson injured in the course of service, the Brown explanation dominated the Court's reasoning. 431 U.S. at 673, 97 S.Ct. at 2058; see also Stencel, 431 U.S. at 676, 97 S.Ct. at 2060 (Marshall, J., dissenting) (Brown explanation was at root of Feres ). Finally, last year, in United States v. Shearer, --- U.S. ----, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985), disallowing an FTCA survivor's suit for negligently failing to prevent the murder of one serviceperson by another, the Court noted that the first two Feres arguments are "no longer controlling," 105 S.Ct. at 3043-44 n. 4, and relied solely on the Brown explanation.
 
 
 40
 Shearer emphasized, however, that "[t]he Feres doctrine cannot be reduced to a few bright-line rules; each case must be examined in light of the statute as it has been construed in Feres and subsequent cases." 105 S.Ct. at 3043. In addition to its warning against too reflexive an application of Feres, the Court's statement is notable as inextricably linking the "Feres doctrine" to "the statute," that is, the FTCA. At no point in the Feres line of cases has the Court ever suggested that its rationale for shutting off servicepersons from the FTCA--however chameleonic--should be extended to other statutes. Indeed, the famous black-letter language from Brown itself refers explicitly only to the FTCA and only to intramilitary suits bred in negligence.
 
 B.
 
 41
 In Chappell v. Wallace, 462 U.S. 296, 304, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), the Court held that "[t]aken together, the unique disciplinary structure of the Military Establishment and Congress' activity in the field constitute 'special factors' which dictate that it would be inappropriate to provide enlisted military personnel a Bivens-type remedy against their superior officers." This was an exercise in double deference--to the military, guided by the Feres doctrine, and to Congress, guided by the separation of powers. In Chappell the Court had been asked to imply judicially, under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), a cause of action for a constitutional tort involving race discrimination alleged by black servicepersons against their superior officers. The Court's refusal to do so on the grounds cited above clearly reflects judicial reluctance to intrude in a sphere Congress had claimed for itself. On the other hand, when the judiciary is asked to interpret a statute, as it is here, the separation of powers rationale disappears, and the task becomes rather one of ascertaining Congress' own intent.[2] That is the situation we confront today with respect to Sec. 1985(3). Although the Feres and Chappell doctrines may aid our inquiry, neither is dispositive.
 
 C.
 
 42
 Some courts have nonetheless extended Feres and Chappell to bar claims under various civil rights statutes, and one court has held that a Sec. 1985(3) claim is barred. See Crawford v. Texas Army National Guard, 794 F.2d 1034 (5th Cir.1986) (barring Secs. 1983 and 1985(2) claims); Martelon v. Temple, 747 F.2d 1348 (10th Cir.1984) (barring Sec. 1983 claim), cert. denied, --- U.S. ----, 105 S.Ct. 2675, 86 L.Ed.2d 694 (1985); Mollnow v. Carlton, 716 F.2d 627 (9th Cir.1983) (barring Sec. 1985(1) claim), cert. denied, 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 547 (1984); Alvarez v. Wilson, 600 F.Supp. 706 (N.D.Ill.1985) (barring Sec. 1985(3) claim). However, other courts have adopted more flexible, ad hoc approaches to intramilitary tort claims under civil rights laws. This case presents us with the dilemma and opportunity of choosing which path to follow.
 
 
 43
 In Brown v. United States, 739 F.2d 362 (8th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 3524, 87 L.Ed.2d 650 (1985),[3] the court, after quickly rejecting plaintiff's argument that Feres-type concerns can never bar civil rights claims, adopted an analysis that delved more deeply into the precise military context of the claim than either Feres or Chappell. Following a prior Eighth Circuit case, Miller v. United States, 643 F.2d 481 (1981) (en banc), the court opted for a multi-factored approach to determine whether Feres applies to a particular situation. Brown's test examines whether the conduct allegedly in violation of the serviceperson's civil rights was truly incident to military service. The court looked at the relationship between the plaintiff's activity at the time of injury and the military service, evaluating separately his duty status (off-duty demands less deference to the military), the location of the injury (off-base also demands less deference), and the nature of the tortious behavior (more deference if connected to a military purpose or mission). Finally, the court assessed whether or how much military discipline would be impeded were the challenged conduct to be litigated in a civil action. The claim in Brown was that a National Guard trainee, on-base but off-duty, had been subject to a mock lynching at a party by fellow trainees due to his race, leading to a suicide attempt that left plaintiff permanently and severely injured. Balancing all the factors, the court held that the Sec. 1981 and Sec. 1983 claims could go forward against the participants in the incident, but not against the victim's superior officers for failing to prevent the incident or for failing to perform a proper investigation of the incident.
 
 
 44
 The First Circuit, in Penagaricano v. Llenza, 747 F.2d 55 (1984), held that Chappell was not dispositive in a Sec. 1983 action for discriminatory and unwarranted separation from the Puerto Rican National Guard. This court, too, adopted a multi-factored test, first enunciated in Mindes v. Seaman, 453 F.2d 197 (5th Cir.1971), not dissimilar from the Eighth Circuit's in Brown: First, plaintiff must allege the deprivation of a constitutional right or the violation of applicable laws or military regulations. Next, plaintiff must exhaust her available administrative remedies.[4] If these two threshold requirements are met, then a four-factor analysis is employed. The court will examine (1) the nature and strength of the challenge, (2) the potential injury if the claim is turned away, (3) the type and degree of anticipated interference with the military function, and (4) the extent to which the exercise of military expertise or discretion is involved. Because the court thought the military's decision to fire plaintiff was a classic example of the fourth factor, it did not allow the Sec. 1983 claim to go forward. The multi-factored approaches adopted by the First and Eighth Circuits in evaluating the survivability of intramilitary actions under civil rights acts seem to me far preferable to a monolithic extension of Feres or Chappell that cuts off all judicial relief even for flagrant constitutional violations gratuitously visited upon servicepersons by their superiors.
 
 II.
 A.
 
 45
 Section 1985(3) was enacted as part of the Civil Rights Act of 1871. Passed in response to Ku Klux Klan anti-Reconstruction activity, the Act provides for various civil rights remedies, with Sec. 1985(3)'s conspiracy prohibition one of several ways for victims to enforce the newly-passed Civil War Amendments. There is no indication that Congress explicitly considered whether or not Sec. 1985(3) should apply to conspiracies to violate the civil rights of servicepersons; nonetheless the language is clearly broad enough to encompass intramilitary tort suits. Under the usual canons of statutory interpretation, the plain meaning rule in particular, Sec. 1985(3) would apply.[5]
 
 
 46
 Following the lead of the First and Eighth Circuits, I would thus hold that Sec. 1985(3) does apply to intramilitary tort suits, and then utilize the Mindes factors--with greater weight placed on the third and fourth factors if necessary to accommodate Feres-Chappell concerns--to cabin potential interference with military activities. The panel's categorical dismissal of Sec. 1985(3) intramilitary tort claims both departs from standard principles of statutory construction and overlooks the fact that some civil rights claims, strong and based on real injury, will not greatly interfere with military operations. Permitting these kinds of claims to go forward better balances the broad remedial reach of civil rights laws with the legitimate morale and discipline concerns of Feres-Chappell.B.
 
 
 47
 The use of Sec. 1985(3) in this case does admittedly present an additional problem independent of intramilitary context.[6] In order for a Sec. 1985(3) claim to succeed, class-based animus must have motivated the defendant in violating the predicate constitutional right alleged in the case. United Brotherhood of Carpenters & Joiners of America, Local 610, AFL-CIO v. Scott, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Petitioner here alleges gender discrimination, and Scott warned that "it is a close question whether Sec. 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause." 463 U.S. at 836, 103 S.Ct. at 3360.
 
 
 48
 Scott, though, explicitly did not settle the issue of what classes may sue under Sec. 1985(3). Some post-Scott courts have held or strongly implied that Sec. 1985(3) does not apply beyond blacks and their civil rights supporters. Gibson v. United States, 781 F.2d 1334, 1341 (9th Cir.1986); Harrison v. Kvat Food Management, Inc., 766 F.2d 155, 157, 160-63 (4th Cir.1985); Wilhelm v. Continental Title Co., 720 F.2d 1173, 1175-77 (10th Cir.1983), cert. denied, 465 U.S. 1103, 104 S.Ct. 1601, 80 L.Ed.2d 131 (1984). Other post-Scott courts have adopted a broader interpretation of the statute, suggesting strongly that gender discrimination would be actionable. Grimes v. Smith, 776 F.2d 1359, 1365 n. 10 (7th Cir.1985) (noting that "[i]t could be argued that the Court's decision in Great American Fed. Savings & Loan Assn. v. Novotny, 442 U.S. 366 ... [99 S.Ct. 2345, 60 L.Ed.2d 957] (1979), implicitly recognized that Sec. 1985(3) could reach a conspiracy founded on a gender-based animus. See id. at 389 n. 6 ... [99 S.Ct. at 2357] (White, J., dissenting)"); D'Amato v. Wisconsin Gas Co., 760 F.2d 1474, 1485-87 (7th Cir.1985) (in rejecting handicapped as a protected class, distinguishes "race, ethnic origin, sex, religion, or politics"); Schultz v. Sundberg, 759 F.2d 714, 718 (9th Cir.1985) (in rejecting Alaska state representatives as a protected class, distinguishes classes that already receive heightened equal protection clause scrutiny). But see Grimes, 776 F.2d at 1366-67 (recognizing Scott's admonition to construe the class-based animus requirement narrowly).
 
 
 49
 One of the cases denying relief under Sec. 1985(3) does, however, provide a strong argument in favor of applying it here. Harrison held that an employee, who was fired by his private employer when he decided to remain on the job while running for local office as a Republican, could not maintain a Sec. 1985(3) suit even though he alleged that the employer treated Democrats differently. Since Scott had noted that Republicans were an intended beneficiary of Sec. 1985(3) because at the time of passage they were generally civil rights supporters, Harrison felt he had an actionable claim. But the Seventh Circuit rejected this position, implying that Republicans were protected in 1871 because they happened to be the group that supported civil rights, not merely because they were Republicans. This mode of statutory interpretation provides a strong argument for including gender-based discrimination within Sec. 1985(3)'s protective ambit. Specifically, the fact that in 1871 blacks were being invidiously discriminated against as a class does not foreclose the possibility that over time other classes would be the victims of invidious discrimination. Indeed, many laws have been interpreted to protect people other than those who were their original beneficiaries. See, e.g., Sedima, S.P.R.L. v. Imrex Co., --- U.S. ----, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (refusing to disregard civil RICO's broad language and apply it only to its original targets). I would read Sec. 1985(3) as the Schultz court did and "require either that the courts have designated the class in question a suspect or quasi-suspect classification requiring more exacting scrutiny or that Congress has indicated through legislation that the class required special protection." 759 F.2d at 718; see also Note, The Class-Based Animus Requirement of 42 U.S.C. Sec. 1985(3): A Limiting Strategy Gone Awry?, 84 Mich.L.Rev. 88 (1985). Allegations of gender discrimination, thus, would make out an actionable Sec. 1985(3) claim.
 
 III.
 
 50
 Application of a multi-factored test for Sec. 1985(3) intramilitary tort suits would accommodate the broad remedial nature of civil rights law to the real concerns of military life. Courts could still give weight to factors that genuinely implicate the needs of the military for obedience and respect. I would note, however, that an air force officer's persistent refusal to honor the air force's own code against gender discrimination would not appear to rise to the level of a genuine military concern. Section 1985(3) itself contains a number of threshold requirements that will limit its use.[7] The need to allege conspiracy, the need in most cases for governmental action to be present, and the requirement of class-based animus all would go far toward eliminating nuisance suits.
 
 
 51
 Second, and importantly, the doctrine of qualified immunity, as enunciated in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), provides officials who have acted in objective good faith, which includes unconstitutional behavior that at the time was not clearly established as such, with a cloak of protection against litigants.
 
 
 52
 With these inherent limitations of Sec. 1985(3) in mind, and in light of the standard canons of statutory interpretation and the precise contours of the Feres doctrine and Chappel, I would construe Sec. 1985(3) to permit appellant's intramilitary tort claim to proceed. Of course, it would be necessary for the District Court to determine on remand whether a Mindes-type balance tips in favor of appellant, and whether other thresholds of Sec. 1985(3) and qualified immunity have been overcome.
 
 I thus dissent from Part IV(A).[8]
 
 
 [1]
 Three separate opinions were filed by the District Court, namely on August 29, 1983, August 20, 1984, and February 26, 1985. See Joint Appendix at 52, 75, 301. No. 84-5739 is Bois's appeal from the first two decisions of the District Court; No. 85-5253 is her appeal from the final District Court decision. This case was before the District Court as Captain Joyce L. Bois v. John O. Marsh, Jr., et al., Civil Action No. 80-1030
 
 
 [2]
 Major Beale also made a "background" finding that "an extreme underrepresentation" of female audiologists existed within the Army. This conclusion was based solely on a comparison of the percentage of Army audiologists who are female with the percentage of civilian audiologists who are female. See J.A. at 221
 
 
 [3]
 On August 16, 1978, Major Beale sent his report to Colonel Sedge's immediate supervisor, Colonel Robert L. Henderson. Colonel Henderson, in turn, sent the report to Colonel Waugh, Walter Reed's Deputy Commander. These actions were taken pursuant to Army regulations providing that "[t]he chain of command is the primary channel for correcting discriminatory practices and for communication of equal opportunity matters," A.R. 600-21 (20 June 77) ch. 1, p 1-4b; J.A. at 154
 
 
 [4]
 Section 1985(3) provides as follows:
 Depriving persons of rights or privileges
 (3) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.
 42 U.S.C. Sec. 1985(3) (1982).
 
 
 [5]
 Bois maintains that she was, in effect, forced to leave the Army by virtue of Sedge's strategic position which, in her view, could have seriously and adversely affected her opportunities for advancement as an Army audiologist. It is undisputed in the record before us, however, that she was not discharged from the service, but to the contrary was given an audiology assignment at Fort Hood, where she received outstanding marks for her performance. Moreover, her vague allegations, especially when unsupported by an affidavit or other evidence explaining how Sedge might hurt Bois's career in the future, are insufficient to state a claim for constructive dismissal
 
 
 [6]
 Standing analysis also leads to the conclusion that Bois's request for equitable relief is not justiciable. See Warth v. Seldin, 422 U.S. 490, 505, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975)
 
 
 [7]
 Although this theory of injury is plausible, plaintiff has failed to allege any concrete facts suggesting that this relatively minor blemish on her overall military record has hindered her career outside the Army. In light of our application of exhaustion principles, see infra at 474-75, however, we need not decide whether the alleged negative implication in her Army record, by itself, would enable us to reasonably infer the injury necessary to satisfy Article III. See Warth v. Seldin, 422 U.S. 490, 504, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975)
 
 
 [8]
 The Board also has statutory authority to order retroactive backpay or retroactive promotion. Id. Sec. 1552(c), (d)
 
 
 [9]
 The Board's decisions are subject to judicial review and may be set aside if they are arbitrary and capricious. Chappell, 462 U.S. at 303, 103 S.Ct. at 2367
 
 
 [10]
 Bois attempts to distinguish Chappell from the instant case on the ground that Chappell arose in a "combat setting." See Brief at 41 n. 38. That is, fairly viewed, a mischaracterization. Although the Court noted that the plaintiffs in that case served on a "combat naval vessel," 462 U.S. at 297, 103 S.Ct. at 2364, nothing in the opinion indicates that this vessel ever saw combat during the period in question. Moreover, as the Court itself stated, "conduct in combat inevitably reflects the training that precedes combat." Id. at 300, 103 S.Ct. at 2365
 
 
 [11]
 Requiring Bois to exhaust her administrative remedies will also "vindicate the fundamental doctrine that courts should avoid passing on unnecessary constitutional questions." Sohn, 365 F.2d at 919 (footnote omitted); see also Nelson v. Miller, 373 F.2d 474, 480 (3d Cir.), cert. denied, 387 U.S. 924, 87 S.Ct. 2042, 18 L.Ed.2d 980 (1967)
 
 
 [12]
 Other courts, however, have held that Feres bars claims under other civil rights statutes. See, e.g., Brown v. United States, 739 F.2d 362 (8th Cir.1984) (42 U.S.C. Secs. 1981, 1983), cert. denied, --- U.S. ----, 105 S.Ct. 3524, 87 L.Ed.2d 650 (1985); Mollnow v. Carlton, 716 F.2d 627 (9th Cir.1983) (42 U.S.C. Sec. 1985(1)) cert. denied, 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 126 (1984)
 
 
 [13]
 The dissent contends that our reading of Feres and Chappell inverts the customary rules of statutory construction. But Feres itself represents a refusal to read statutes with their ordinary sweep. The unique setting of the military led the Feres Court to resist bringing the armed services within the coverage of a remedial statute in the absence of an express Congressional command. Moreover, Feres principles were invoked by the court in Chappell to foreclose assertion of constitutional rights. Taken together, Feres and Chappell powerfully suggest that the obvious adverse effects on military discipline, which animated the Court in both of those cases, counsel against an expansive interpretation of another remedial statute so as to encompass the military
 We are also unpersuaded by the dissent's attempt to distinguish the Supreme Court's teachings in these two cases. The dissent speculates that the Feres Court was relying upon the general principle that "all sovereign immunity statutes are construed narrowly." Dissent at 475 n. 5 (citations omitted). Thus, the dissent argues, the Feres approach to statutory construction should not be applied to "a broad civil rights law" that does not implicate sovereign immunity concerns. Id. at 475 n. 5. But, as noted above, the Supreme Court has repeatedly explained that Feres was based primarily on the presumption that Congress did not intend to create a cause of action that would undermine the discipline of the Nation's military. The dissent offers no reason, consistent with the Court's emphasis on military discipline, why that presumption should not apply here, but rather concedes that "[t]here is no indication that Congress explicitly considered whether or not Sec. 1985(3) should apply to conspiracies to violate the civil rights of servicepersons." Id. at 475.
 The dissent disregards Chappell on the supposition that it "reflects primarily separation of powers concerns," id. at 472, that disappear "when the judiciary is asked to interpret a statute," id. at 6. But Chappell will not reasonably bear such a crabbed interpretation. To the contrary, the Supreme Court expressly held in Chappell that the same analysis, based on concern with the disruption of military discipline, applies regardless of whether a court is asked to entertain an intramilitary suit under the Constitution or a statute. See, e.g., 462 U.S. at 299, 103 S.Ct. at 2365 ("Although this case concerns the limitations on the type of nonstatutory damages remedy recognized in Bivens, rather than Congress' intent in enacting the Federal Tort Claims Act, the Court's analysis in Feres guides our analysis in this case."); id. at 304, 103 S.Ct. 2367 ("Here, as in Feres, we must be 'concern[ed] with the disruption of "[t]he peculiar and special relationship of the soldiers to his superiors" that might result if the soldier were allowed to hale his superiors into court.' " (citations omitted)).
 
 
 [14]
 Relying on Grimes v. Smith, 776 F.2d 1359 (7th Cir.1985), the Government urges that we dismiss Bois's Sec. 1985(3) claim on the ground that Sec. 1985(3) applies only to racially-motivated conspiracies. Bois counters this argument by asserting that when Sec. 1985(3) was enacted, military personnel were permitted to bring damage claims for intentional torts against their superior officers. Bois contends that because Wilkes v. Dinsman, 48 (7 How.) U.S. 89, 12 L.Ed. 618 (1849), 53 U.S. (12 How.) 390, 13 L.Ed. 1036 (1851), permitted such a suit not many years prior to the enactment of Sec. 1985(3), Congress must have intended for the broad language of that statute to apply in the military context as well. We are not persuaded that Congress' intent about the reach of Sec. 1985(3) can reasonably be inferred from the mere existence of this earlier Supreme Court decision. But in light of our conclusion that the policies enunciated in Feres and its progeny preclude Bois's Sec. 1985(3) claim, we need not reach the unsettled question whether Sec. 1985(3) applies to conspiracies other than those that are racially motivated
 
 
 [1]
 In Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), the Supreme Court referred to the first and third Feres rationales in denying an FTCA claim under the "discretionary function" exception, 28 U.S.C. Sec. 2680(a). In Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the Court relied on the first and second Feres rationales in permitting a suit against the Coast Guard for the negligent operation of a lighthouse
 
 
 [2]
 This was also, of course, the task before the Feres Court. See note 5 infra
 
 
 [3]
 The panel somewhat misleadingly cites this case at note 12 as "[holding] that Feres bars claims under other civil rights statutes." While Brown did bar some Sec. 1981 and Sec. 1983 claims, it did so after a much more detailed analysis of the factual context than a simple citation to Feres would allow. Furthermore, Brown permitted other intramilitary Sec. 1981 and Sec. 1983 claims to proceed. See discussion in text
 
 
 [4]
 As noted above, I join in Part III of the panel's opinion dismissing the suit against the Air Force for failure to exhaust administrative remedies. Thus, even under my more flexible interpretation of Sec. 1985(3), the question would arise whether this plaintiff is barred from suing Sedge on the same ground. The Ninth Circuit has required exhaustion in this context. Trerice v. Pedersen, 769 F.2d 1398, 1402 (1985). Tentatively, I agree, believing that a Sec. 1985(3) damages action in the intramilitary context might require exhaustion of administrative remedies, even though those remedies obviously do not provide money damages
 I recognize that such a requirement would be an exception to standard exhaustion doctrines. See, e.g., United States Alkali Export Ass'n v. United States, 325 U.S. 196, 210, 65 S.Ct. 1120, 1128, 89 L.Ed. 1554 (1945) (government need not seek Federal Trade Commission action before prosecuting under Sherman Act, because FTC can only "investigate, recommend and report. It can give no remedy."); Knehans v. Alexander, 566 F.2d 312, 315 (D.C.Cir.1977) (Board for Correction of Military Records "has by implication sufficient authority to provide the relief appellant now seeks: full reinstatement and backpay"); Hodges v. Callaway, 499 F.2d 417, 420-21 (5th Cir.1974) ("[A] plaintiff obviously need not appeal to the particular [Discharge Review Board] or [Board for Correction of Military Records] if the relief requested is not within the authority or power of those bodies to grant."); K. Davis, Administrative Law Treatise 97, Sec. 20.07 (1958). However, permitting servicepersons to bypass the intramilitary relief systems that do exist in order to pursue civil rights claims against other servicepersons in federal court may be neither necessary nor desirable. Indeed, successful utilization of available intraservice remedies may often alleviate the need for actual litigation by reducing the injury or damage done the plaintiff.
 An exhaustion requirement is not inconsistent with rejection of a fullscale preclusion of Sec. 1985(3) in the intramilitary context. It accommodates appropriate deference to the military through timing rather than an absolute jurisdictional bar.
 
 
 [5]
 The Supreme Court's construction of the FTCA in Feres is distinguishable. The third Feres rationale was that Congress' silence with regard to the military indicated a desire to exclude them because Congress had already legislated a comprehensive system of insurance for them. 340 U.S. at 144 & n. 12, 71 S.Ct. at 158 n. 12. Like the FTCA, this insurance system for servicepersons provides compensation from the public coffers for injuries due to negligence, and represents a waiver of sovereign immunity. Thus, the Feres Court might reasonably have inferred from the FTCA's silence about the military a lack of intent to include them despite the fact that such an inference is a distinctly unorthodox method of statutory construction. The Court may have felt confident that a legislative body considering the one sovereignty waiver statute would necessarily have been aware of the other related sovereignty waiver statute. In general, all sovereign immunity statutes are construed narrowly. See Library of Congress v. Shaw, --- U.S. ----, 106 S.Ct. 2957, 92 L.Ed.2d 250 (U.S.1986) (Title VII's provision that "the United States shall be liable for costs the same as a private person," 42 U.S.C. Sec. 2000e-5(k), not explicit enough to waive the government's sovereign immunity from interest); McMahon v. United States, 342 U.S. 25, 72 S.Ct. 17, 96 L.Ed. 26 (1951) (courts construe waivers of sovereign immunity strictly in favor of the sovereign); United States v. Sherwood, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) (the United States is immune from suit absent its consent); Thompson v. Kennickell, 797 F.2d 1015 (D.C.Cir.1986) (1982 amendments to 28 U.S.C. Sec. 1961 not explicit enough to waive sovereign immunity for awards of post-judgment interest when government unsuccessfully appeals a money judgment rendered against it in a civil action)
 Unlike the FTCA Congress, the KKK Act Congress was not dealing with a subject matter like sovereign immunity where it could be expected to focus on the peculiar status of the military. The KKK Act is a broad civil rights law designed to provide a remedy for intentional torts (not negligence) against private persons (in addition to public ones) and represents the affirmative creation of a new cause of action (not merely the lifting of a ban on effecting existing rights). It is therefore not reasonable to infer that the KKK Act Congress meant to exclude the military by silence. Civil rights laws, unlike waivers of sovereign immunity, are generally construed broadly to further their obvious remedial purposes.
 
 
 [6]
 In addition to the class-based animus requirement discussed in the text, Sec. 1985(3) requires (1) a conspiracy, (2) an act in furtherance of the conspiracy, and (3) the injury to or the deprivation of a right or privilege of the plaintiff. Griffin, 403 U.S. at 102-03, 91 S.Ct. at 1798-99. Plaintiff has alleged conspiracy. Fifth Cause of Action, Second Amended Complaint at 34-35. Also, if the predicate constitutional violation itself requires governmental action, then so does a Sec. 1985(3) claim. Scott, 463 U.S. at 831-34, 103 S.Ct. at 3357-59. Sedge is a governmental actor
 Whether such governmental action may be that of the federal government or must be that of a state government has not been discussed by the Supreme Court. This circuit, however, has held that federal as well as state action may underlie a Sec. 1985(3) claim. Hobson v. Wilson, 737 F.2d 1, 19-20 (D.C.Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). But see Santistevan v. Loveridge, 732 F.2d 116, 118 (10th Cir.1984) (only state action).
 
 
 [7]
 See note 6, supra
 
 
 [8]
 I recognize that some, though not all, of the same problems are involved in applying the Feres doctrine to state law-based tort claims, addressed in Part IV(B) of the panel's opinion. There is, however, a different and weighty concern in those cases, as expressed in the original Feres case, 340 U.S. at 142-44, 71 S.Ct. at 157-58, about not subjecting military personnel to the varying dictates of different state laws. On balance, I do not find the considerations in favor of allowing such claims persuasive enough to cause me to dissent from the majority disposition in Part IV(B), especially if, as I advocate, a federal cause of action were recognized for egregious violations of constitutional rights under Sec. 1985(3)